FRED J. DEWITT ET UX V. JACQUE O. BROOKS ET UX.

No. A-147. Decided June 21, 1944.
Rehearing overruled October 25, 1944.
Second Motion for rehearing overruled November 22, 1944.
(182 S. W., 2d Series, 687.)

*Leonard Brown,* of San Antonio, for petitioners.

It was error for the Court of Civil Appeals to hold that the judgment of the district court, holding that the minor child was

a dependent child, was void because of lack of notice to the parents. Long v. Smith, 162 S. W. 25; Bell v. Thompsen, 273 S. W. 1109; Schlitz v. Roenitz, 56 N. W. 194.

*Davis, Hall, Clement & Knight,* of San Antonio, for respondents.

The judgment of the trial court holding that the minor child was a dependent, was not binding on the respondents, the natural parents of the minor child, because they had no notice of the proceedings to declare the child a dependent. Glass v. Smith, 66 Texas 549; Bozeman v. Arlington Heights Sanitarium, 134 S. W. (2d) 350; Windsor v. McVeigh, 93 U. S. 277.

. MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

This suit was brought by Jacque O. Brooks and wife, the natural parents of a small child, against Fred J. DeWitt and wife, the adopting parents of said child, to recover the custody of the child.

When the child was about two months old the parents left it with Mrs. Grooms in San Antonio, promising to pay her for keeping the child. They intended to go to Florida, their home state, where they hoped to obtain employment and settle a lawsuit which they had pending in that state. They were to send money to have the child brought to them when they arrived in Florida. After reaching Florida they made remittances for a few weeks for the care of the child, but finally ceased to do so; and Mrs. Grooms, being unable to hear from them, turned the child over to Mrs. R. C. Hugman, Executive Secretary of the San Antonio Social Welfare Bureau. Mrs. Hugman filed a petition in the district court, and had the child adjudged a dependent child and the custody thereof awarded to her as Executive Secretary of said welfare bureau. The court later, on a proper petition, permitted the DeWitts to adopt the child.

Upon the trial of the case at bar the judgment of the trial court was in favor of the adopting parents, but the Court of Civil Appeals reversed the judgment of the trial court, and rendered judgment in favor of the natural parents, 178 S. W. (2d) 718.

The trial court found that Mr. and Mrs. Brooks had no notice of either the dependency proceeding or the adoption proceed-

ings. The court further found that both Mr. and Mrs. Brooks and Mr. and Mrs. DeWitt were suitable persons to have custody of the child, but awarded the custody to the DeWitts, holding that the child had been duly and legally adopted by them.

It is plaintiffs' contention, in effect, that since they had no notice of the dependency proceedings, such judgment is in nowise binding on them; and since they established upon the trial that they were the natural parents of the child, and the trial court found that they were suitable persons to have the custody of the child, that they were entitled, as a matter of law, to a judgment awarding them the custody of the child.

Revised Statutes Article 2330 provides, in effect, that any child under sixteen years of age who is dependent upon the public for support, or who is destitute or homeless or abandoned, is a dependent or neglected child. Article 2331 provides for the institution of proceedings to have a child adjudged to be a dependent or neglected child. Article 2332 provides that if the parents or guardian of the child are not within the county where the proceedings are instituted, it shall not be necessary to serve them with citation, but the court shall appoint some suitable person to represent the best interests of the child. Article 2335 provides that if the court adjudges the child to be a dependent or neglected child, an order may be made making disposition of the child by awarding it to some suitable person or institution. Said Article further provides:

"It may be turned over to the care and custody of any suitable pereson or any suitable institution in the county or State organized for the purpose of caring for 'dependent children,' and which is able and willing to care for same. And when such child is so turned over to the custody of such person or institution, such person or institution shall have the right to the custody of said child, and shall be at all times rseponsible for its education and maintenance, subject at all times to the order of the court." Article 2336 authorizes the court to change the custody of the child when necessary, and Article 2337 provides as follows:

"In case any child is adjudged to be dependent or neglected under this title then such parents or guardian shall thereafter have no right over or to the custody, services or earnings of said child except upon such conditions in the interest of such child as the court may impose, or where, upon proper proceedings, such child may lawfully be restorted to the parents or guardian."

The proceedings by which the child in question was adjudged to be a dependent and neglected child appear to be regular, and

to have been carried on in the manner provided by the statutes. The trial court specifically found that no fraud was committed by any one in connection with said proceedings, and that a full disclosure of the residence of the plaintiffs was made at the time the proceedings were had. The judgment in the dependency proceedings recited that the court found that the parents had abandoned and neglected the child, and that it was destitute and homeless and without proper parental care. The child was adjudged to be a dependent child, and the parental rights of its natural parents were declared to be terminated, and the custody of the child was vested in Mrs. Hugman, Executive Secretary of said welfare bureau, subject to the further orders of the court.

The trial court upon the trial of the case at bar concluded that the proceedings in the dependency case were valid.

██ While ordinarily the natural parents are entitled to the custody and care of their child, this is not an absolute unconditional right. The State has such an interest in the welfare of its citizens as will authorize the enactment of suitable legislation by which the State may assume the custody of children and the parents may be deprived of the custody thereof where the parents abandon the children or neglect them in such manner as to cause them to become a public charge, or where the parents otherwise prove to be unsuitable. 39 Am. Jur., p. 602, sec. 15; 27 Am. Jur., p. 828, sec. 107; Schiltz v. Roenitz, 86 Wis. 31, 56 N. W. 194, 21 L. R. A. 483, 39 Am. St. Rep. 873; Fischer v. Meador, 95 N. J. L. 59, 111 A. 503; Davis et ux. v. Sears et ux. (Com. App.), 35 S. W. (2d) 99; Legate v. Legate, 87 Texas 248, 28 S. W. 281. Proof of the unsuitableness of the parents to have the custody of their children may be shown by evidence that they had abandoned them. 39 Am. Jur., p. 617, sec. 27; Nugent v. Powell, 4 Wyo. 173, 33 Pac. 23, 62 Am. St. Rep. 17, 20 L. R. A. 199; Re Lally, 85 Iowa 49, 51 N. W. 1155, 16 L. R. A. 681. The legislation above referred to was enacted for that purpose; and the judgment entered in March, 1941, declaring the child to be a dependent child and awarding the custody thereof to Mrs. Hugman, Executive Secretary of said welfare bureau, was in accordance with the authority granted in such statute.

█ The only serious attack made on the judgment adjudging the child to be a dependant child and awarding its custody to Mrs. Hugman is that Mr. and Mrs. Brooks had no notice there-

of. Hence it is contended that the judgment in that case is not binding on them.

It will be noted that the statute, Article 2332, authorizes the court to adjudge a child to be a dependent child upon a proper showing, without notice to the parents, where the parents are out of the county. The power of the State to so adjudge a child to be dependent where the facts warrant it, without notice to the parents where they are inaccessible, must necessarily exist because of the exigencies of the case. Children of tender years who have been abandoned or neglected and are in distress cannot wait for attention indefinitely while search is being made throughout the country for their parents and service is had on them. Delay might be runious. It is a matter of importance that action be taken at once for the protection of the child. Someone must be given authority to take possession and custody of the child at once and supply its needs. The Legislature in recognition of the need of prompt action in such cases has provided for summary proceedings for the taking of such children into custody and the awarding of the custody thereof to a suitable person or institution for the protection of the children.

■ It is generally held that a statute authorizing such summary proceedings without notice to the parents is constitutional, and that degree entered in accordance therewith is valid, subject only to the right of the parents or guardian who were without notice thereof to a full hearing in a subsequent proceeding on the issue as to whether the child was, in fact, a dependent and neglected child. 39 Am. Jur., p. 604, sec. 17; 31 Am. Jur., p. 802, sec. 35; Jensen v. Hinchley, 55 Utah 306, 185 p. 716; People ex rel Riesner v. New York Nursery and Child's Hospital, 230 N. Y. 119, 129 N. E. 341; Re John Sharp, 15 Idaho 120, 96 p. 563, 18 L. R. A. (N. S.) 886; Farnham v. Pierce, 141 Mass. 203, 6 N. E. 830, 55 Am. Rep. 452. This question was discussed in the case of Allen v. Williams, 31 Idaho 309, 171 Pac. 493, 494. That case involved a delinquency proceeding, and not a dependency proceeding, but the rule in this respect is the same. It was there said:

"The plaintiff is proceeding under the impression that due process of law requires that the determination of the parent's rights to the custody of his child must precede any interference therewith. This view cannot be sustained. Our statute was enacted as a matter of protection to the child and for the welfare of the state. The Legislature, in enacting this law, no doubt saw the wisdom of prompt commitment of a child who is upon the righ road to becoming a moral degenerate and perhaps a

future charge upon and a disgrace to the state. To drag such a case through a lengthy and formal criminal or civil proceeding without prompt detention and commitment of the child would in many cases thwart the object of the law. It might in many cases be a matter of high importance that action be taken without delay.

"The legislature having determined that a summary proceeding was necessary, requiring the immediate taking of children into custody in the interest of their moral welfare and education and as a protection to the state, the parent or guardian of a child removed from his custody is not denied the due process of law if an adequate remedy is available by which he may afterwards have his rights presented to a proper tribunal and determined."

But where the parents are without notice of the proceedings, they must be allowed a full hearing in a subsequent proceeding on the issue of whether sufficient facts existed as to authorize the entry of the judgment of dependency. Ex parte Clarke, 82 Neb. 625, 118 N. W. 472; 20 L. R. A. (N. S.) 171; Schiltz v. Roenitz, 86 Wis. 31, 56 N. W. 194, 21 L. R. A. 483, 39 Am. St. Rep. 873; Child Saving Institute v. Knobel, 327 Mo. 609, 37 S. W. (2d) 920, 76 A. L. R. 1068.

If upon such subsequent hearing it appears that the parents had abandoned the child, or otherwise neglected it to such an extent that it had in fact become a dependent or neglected child within the meaning of the statute, then the proceedings are valid even as against the parents, although they had no notice of the proceedings. 9 Am. Jur., p. 604, sec. 17; People ex rel. Lentino v. Feser et al, 195 App. Div. 90, 186 N. Y. S. 443.

Parents may voluntarily relinquish their right to the custody of their child either by agreement or by abandonment or by such other neglect or mistreatment as will authorize the intervention of the State for the best protection of the child, and when they do so, the State has the lawful right to award the custody of such child to others. While a parent who had no notice of the proceedings in which a child was adjudged to be a dependent child is not cut off from his right to show in a subsequent hearing that he had not allowed his child to become a dependent child, yet, if upon such subsequent hearing it appears that he had in fact allowed his child to become a dependent child, then the judgment declaring the child to be a de-

pendent child and awarding its custody to some one else becomes binding upon him.

In the case at bar the proceedings appear to have been conducted strictly in accordance with the statute. The judgment declaring the child to be a dependent child and awarding its custody to Mrs. Hugman as Executive Secretary of the Welfare Bureau was therefore valid, subject only to the right of the parents to have determined in a subsequent proceeding whether they had in fact abandoned the child or otherwise allowed it to become a dependent and neglected child. Upon the trial of the suit here involved the trial court appears to have allowed a full hearing on the question as to whether the parents had abandoned or neglected the child. Findings of fact and conclusions of law were filed by the trial court. While the court did not specifically find that the parents had abandoned the child, the court did find facts which would have justified the court in so concluding, and the court did conclude that the judgment in the dependency proceeding was valid. The judgment in the dependency proceeding could not have been sustained except on the theory that the child had been abandoned. Under these circumstances we must presume, in support of the judgment, that the court impliedly found that the parents had abandoned the child. Rule 299, Texas Rules of Civil Procedure.

The Court of Civil Appeals, after holding in effect that the burden was upon the DeWitts to establish that Mr. and Mrs. Brooks had abandoned the child, further held, "This burden defendants failed to meet." The court then proceeded to reverse the judgment of the lower court and render judgment in favor of the appellants. From this we assume that the court held that as a matter of law there was no evidence to support the judgment. There was no assignment to the effect that there was no evidence to support the judgment; but even if there had been, we think the Court of Civil Appeals was in error in so holding. In our opinion there was ample evidence to sustain the trial court's implied finding that the parents had abandoned the child.

The evidence shows that Mr. and Mrs. Brooks had previously resided in Florida. They went to San Antonio in July or August, 1940, to obtain work. The child was born in San Antonio on September 9, 1940. The parents were unable to secure satisfactory employment in San Antonio, and decided to return to Florida. Some of the witnesses testified that Mrs. Brooks stated that she knew that she would have to give up either the child or her husband, and she supposed it would be her child. The evidence shows

that Mr. Brooks went to one or two charitable institutions in San Antonio and sought permission to leave the child with such institution or institutions, but was unable to do so because the child was too young. Mr. Brooks testified that it was his intention to leave the baby with the instiution only so long as would be necessary to enable him to send for it. He had a lawsuit pending in Florida for personal injuries to his wife, and he expected to settle the suit after returning to Florida, and thereby obtain money to send for the child. They had been boarding with Mrs. Grooms while in San Antonio, and they finally arranged with her to keep the baby for them until they could send for it. They agreed to pay her $5.00 per week for caring for the child. Before leaving for Florida, however, Mrs. Brooks, with the connivance of her husband, gave four or five bad checks for as many separate purchases of merchandise, receiving some cash in change in these transactions. They testified that they did this to get money to return to Florida, intending to redeem the bad checks when they settled the lawsuit in Florida. However, the officers apprehended them before they could leave the city and kept them in jail for a day or two. They were finally released after Mrs. Brooks had paid a fine and the checks had been redeemed with money obtained from her mother. It was late at night when they were released from jail. They made plans to leave immediately by automobile for Florida. At first they planned to take the baby with them, but the weather was very cold and Mrs. Grooms convinced them that the baby might die en route from cold, and she persuaded them to leave the baby with her. The trial court found that they were to send for the baby when they arrived in Florida. In the meantime they were to send Mrs. Grooms $5.00 per week for caring for the child. They left by automobile for Florida on November 15, 1940, leaving the baby with Mrs. Grooms under the agreement above set out. While they did not remit the full amount as promised, they did remit a total of $21.00 from November 15, 1940, to January 4, 1941, for the care of the child. They arrived in Florida within a reasonable time and corresponded with Mrs. Grooms regularly until January 4, 1941, but they ceased corresponding with her on that date, and she did not hear from them thereafter until after the child had been adopted by the DeWitts. It appears that in the latter part of December, 1940, the Houston police made inquiry of Mrs. Grooms as to the whereabouts of Mr. and Mrs. Brooks. The police were seeking to arrest them for some bad checks they had given in Houston. Mrs. Grooms communicated this fact to Mrs. Brooks, and thereafter no further communication was received from either Mr. or Mrs. Brooks.

Mrs. Grooms wired Mrs. Brooks once and wrote her several times, but received no reply. One letter was returned undelivered. Brooks was a shoe salesman, and he and his wife lived in three or four different cities in Florida during this interval. Mrs. Brooks admitted that she had not communicated with Mrs. Grooms during this interval. She testified that her husband ordered her to cease corresponding with Mrs. Grooms because the reports made by Mrs. Grooms concerning the police made her nervous and injured her health. Mr. Brooks testified to the same effect.

Mrs. Grooms was a woman of limited means and felt she could not keep the child any longer without compensation. Mrs. DeWitt was a sister of Mrs. Grooms and lived on or near the same premises with her, and was familiar with the circumstances under which the baby had been left with Mrs. Grooms, as well as the facts that had transpired subsequent to that time. She expressed a willingness to adopt the child. Mrs. Grooms, contacted the San Antonio Social Welfare Bureau on March 10, 1941, and made full disclosure of the facts, and that organization filed a petition in the district court on March 12, 1941, and had the child adjudged a dependent child on March 21, 1941. Mr. and Mrs. DeWitt immediately filed a petition for the adoption of the child, and secured a decree authorizing them to adopt the child on March 31, 1941.

Mr. and Mrs. Brooks telephoned Mrs. Grooms from Florida on May 12, 1941. Mr. Brooks testified that he told Mrs. Grooms that they had the money to pay for bringing the baby to them, and wanted her to bring the baby at that time. Mrs. Grooms testified that Mrs. Brooks said that they would have the money within about six weeks, and would want her to bring the child to them. Mrs. Grooms then informed them for the first time that the DeWitts had adopted the child. Mr. and Mrs. Brooks expressed great indignation over the adoption of the child, but they did nothing about it until August, 1942, about fifteen months after they had learned that the DeWitts had adopted the child, when they telephoned the attorney in San Antonio who had represented them in the criminal case, and asked him to look into the matter for them. He advised them promptly by letter that the proceedings appeared to be regular, and he did not think the adoption could be set aside unless they could prove that a fraud had been perpetrated on the court. They took no further action in the matter until they returned to San Antonio in March, 1943, and filed this suit to recover the custody of the child on May 12, 1943. They stated as a reason for not taking

steps to regain custody of the child sooner that they were out of funds. However, Mrs. Brooks testified that they settled their lawsuit in Florida in March, 1941, and received $200.00 in cash as their part of the settlement. This was over and above the fee which they had to pay their attorney. They testified that they were waiting until they could obtain more money and find a suitable apartment before sending for the baby. Mr. Brooks, when asked why he did not do something toward obtaining custody of the child sooner, testified, "I knew the people were waiting for me out here to call Houston and have the law on me, and with about $100.00 in my pocket, and I knew I had done wrong, and I wasn't coming back out here and stick my neck out until I had the money to tend to it right." They had about $2,000.00 when they returned to San Antonio in March, 1943.

■ In determining whether or not Brooks and wife had so abandoned the child as to allow it to become a dependent and neglected child within the meaning of the statute, the trial court had the right to consider not only the facts that transpired prior to the adjudication of dependency, but also the facts that occurred subsequent thereto, as circumstances showing the intention of Mr. and Mrs. Brooks on the issue of prior abandonment.

The facts show that the child was only a few weeks old when Mr. and Mrs. Brooks left it with Mrs. Grooms. The parents went to a distant State, promising to send money for the child's care and to send for it when they reached Florida, but they failed to do so. For a period of ten weeks prior to the time the child was adjudged to be a dependent child, they not only failed to contribute to its support, but purposely declined to communicate with Mrs. Grooms, who had the child. They must have known that she was not financially able to care for the child indefinitely without assistance from them. They had no right to presume that she would continue to do so. Although they received $200.00 from the settlement of a lawsuit in March, 1941, they failed to send for the child or remit anything for its support, or to make inquiries concerning its welfare. While they expressed indignation when they learned on May 12, 1941, that the child had been adopted by the DeWitts, they did nothing about it— not even so much as the writing of a letter—until fifteen months later, when they wrote their lawyer in August, 1942; to look into the matter. It is very probable that parents who had really intended to keep their child in their family would have evidenced much more concern than was shown by these parents upon learning that some one else had adopted their child and was asserting the right to the custody thereof. Their excuse that they were

without funds is not convincing. They admittedly had $200.00 which they could have used for this purpose. This sum was ample to enable them to lodge a protest with the proper authorities, and to return to Texas for the purpose of prosecuting their claim for the custody of the child. But they waited nine months longer—two years in all after learning that their child had been adopted by the DeWitts—before taking any sort of action to recover the child. In the meantime they had allowed the DeWitts to nurse and care for it through its most dependent period, and to become attached to it. Under the circumstances we think the evidence was sufficient to justify the trial court in concluding that the child had been abandoned by its parents and was in fact a dependent and neglected child at the time it was so adjudged. If so, then the court properly adjudged it to be a dependent child and awarded its custoy to Mrs. Hugman, Executive Secretary of the Welfare Bureau.

■ There was no assignment in the Court of Civil Appeals that the evidence was insufficient to support the judgment, and since we find there was some evidence to raise the issue, the appellants would not be entitled to have the cause remanded for a new trial on account of the insufficiency of the evidence. Liberty Film Lines, Inc., v. Porter, 136 Texas 49, 146 S. W. (2d) 982.

■ The plaintiffs contend that since they were admittedly the natural parents of the child, and since the trial court found that they were suitable persons to· have the custody of the child, they were, as a matter of law, entitled to its custody. The holding of this Court in the case of State ex rel. Wood v. Deaton, 93 Texas 243, 54 S. W. 901, seems to justify that contention. However, since the rendition of that decision in 1900 the Legislature has by positive enactment, we think, changed the public policy of this State in this respect. Article 2337 provides that in a case where a child has been adjudged to be dependent and neglected. the parents shall thereafter have no right over, or to the custody of, the child, except upon such conditions as may be ordered by the court. Article 2335 provides that when such a child has been turned over to a person or institution in a dependency proceeding, such person or institution shall have the right to the custody thereof. Article 46a (Acts 1931, 42nd Leg., p. 300, ch. 177) provides for judgment authorizing the adoption of children. Section 6 thereof provides in part as follows:

"Consent shall not be required of parents whose parental rights have been terminated by order of the Juvenile Court or other Court of competent jurisdiction; provided, however, that in such cases adoption shall be permitted only on consent of the

superintendent of the home or school, or of the individual to whom the care, custody, or guardianship of such child has been transferred by a Juvenile Court or other Court of competent jurisdiction."

Section 9 of said Act provides "When a child is adopted in accordance with the provisions of this Article all legal relationship and all rights and duties between such child and its natural parents shall cease * *. Said child shall thereafter be deemed and held to be, for every purpose, the child of its parents or parents by its adoption as fully as though born of them in lawful wedlock. * * Said parent or parents by adoption shall be entitled to the * * custody and company of said adopted child. * *" Section 7 of the same Act provides as follows:

"Nothing in this Act shall prevent a Court of Competent Jurisdiction from taking away from such adoptive parent the custody of the adopted child and awarding the same to its natural parents, or either of them or to any other person, upon proof of the bad moral character of such adoptive parent, or upon proof of abuse, neglect or ill treatment of such adopted child by the adoptive parent."

The child here involved was adopted in the manner above provided for.

■ Under the above statutes, we think it is clear that it was the intention of the Legislature of this State that when the natural parents of a child abandon or so neglect the child as to cause it to become a dependent or neglected child within the meaning of the statute, the natural parents thereby forfeit their superior right to the custody of the child, and when a judgment is entered adjudging the child to be a dependent child, and the child is adopted by some other person in the manner provided by law, the adopting parents acquire the superior right to the custody of the child and are entitled to retain the custody thereof so long as the evidence shows that they are suitable persons to have such custody.

The record in this case shows an adjudication of dependency due to the neglect of the parents, and the entry of an order by the trial court terminating the right of the natural parents to the custody of the child. The record further discloses the entry of an order authorizing the adoption of the child by the DeWitts and the transfer of the custody of the child to them. The evidence further shows, and the trial court found, that the DeWitts are

suitable persons to have the custody of the child. Under these circumstances the natural parents are not entitled to the custody of the child as against the adopting parents.

Moreover, the trial judge after seeing the witnesses and hearing their testimony rendered judgment in favor of the DeWitts, and thereby impliedly found that the best interests of the child would be served if the child was left in their custody. This was essentially an issue of fact to be determined by the trial court, and since there was ample evidence to support the finding of the trial court, the Court of Civil Appeals was without authority to overrule that decision. Davis et ux. v. Sears et ux. (Com. App.), 35 S. W. (2d) 99; Tunnell et ux. v. Reeves et ux. (Com. App.), 35 S. W. (2d) 707.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court, awarding the custody of the child to the adopting parents, is affirmed.

Opinion delivered June 21, 1944.

Rehearing overruled October 25, 1944.

Second motion for rehearing overruled November 22, 1944.