Geraldine Simons MARTIN et vir, Appellants,

v.

CAMERON COUNTY CHILD WELFARE UNIT, Appellee.

No. 13470.

Court of Civil Appeals of Texas.

San Antonio.

June 3, 1959.

Rehearing Denied July 1, 1959.

Cox, Patterson, Freeland & Horger, Mc-Allen, Benjamin S. Hardy, Brownsville, for appellants.

Sharpe, Cunningham & Garza, Brownsville, for appellee.

BARROW, Justice.

This is an appeal from a judgment in a child custody and a neglected and dependent proceeding involving the minor child, James Donald Simons. The trial court rendered the original judgment September 18, 1958, declaring the child neglected and dependent. Motion to reopen the case was filed by appellant Geraldine Simons Martin, and thereafter by amended pleading the parents, Geraldine Simons Martin and James Donald Martin, sought the custody of the child. The court conducted the hearing and rendered judgment overruling the motion to reopen and to set aside the original judgment, and rendered judgment awarding the custody of the child to appellee, Cameron County Child Welfare Unit. From that judgment Geraldine Simons Martin and James Donald Martin have appealed.

The background of the child and its parents is as follows:

Geraldine Simons, the mother, graduated from high school in Houston, Texas, in June, 1956. The following September she started to work for Humble Oil and Refining Company in Houston, Texas. In September, 1957, while still working for Humble, she enrolled in night school at the University of Houston. Donald Martin, the father, after four and one-half years in service in the Marine Corps, also entered night school at the University of Houston, where he met Geraldine, and they started going steady. In February, 1958, after consulting Dr. Dean D. Curtis, a Houston doctor, it was determined that Geraldine was pregnant. Shortly thereafter, during the same month, Donald Martin acknowledged to Dr. Curtis that he was the father of the child, but declined to marry Geraldine. In March, 1958, Dr. Curtis after discussing with Geraldine the matter of solving the problem, suggested that he knew of a couple who would like to adopt a child, whereupon he took the matter up with Irvin Moore, head of the Child Welfare Board at Wharton, Texas. Thereafter a conference, arranged by Dr. Curtis, was had between Geraldine and Mrs. Jeanne Young, welfare worker of the State Child Welfare Department, and a plan was made to care for Geraldine during pregnancy and immediately following, by said Department.

Thereafter, in May, 1958, Geraldine, pursuant to arrangements made by the Welfare Department, left Houston and went to San Benito, Texas, to stay in a licensed foster home of Mrs. Bert Frazier, and to be under the care and supervision of the Child Welfare Office at Brownsville, Texas. She was assigned to the supervision of Mrs. Margaret Palmer, a welfare worker of the Cameron County Child Welfare Unit.

On September 13, 1958, a child, James Donald Simons, was born to Geraldine Simons at the Valley Baptist Hospital in Harlingen, Texas. On Monday, September 15, 1958, a sworn petition was filed by Mrs. Palmer, requesting that the child be declared dependent and neglected. The next day Geraldine asked Mrs. Frazier to tell Mrs. Palmer that she wanted to keep her baby. Mrs. Frazier so advised Mrs. Palmer, whereupon Mrs. Palmer called on Geraldine, but did not get her to change her mind. Mrs. Palmer called Mrs. Young in Wharton and advised her of Geraldine's attitude. Mrs. Palmer went to Mrs. Frazier's house and solicited her help in getting Geraldine to release the baby for adoption. Someone called Dr. Curtis and advised him of Geraldine's decision. That same afternoon Dr. Curtis called Geraldine and she got up out of bed and went into the hall for a lengthy long-distance telephone conversation with him. Immediately after talking to Dr. Curtis, Mrs. Palmer came in with the papers, consisting of the waiver of service in the dependency hearing and a consent to the adoption of the child, giving custody to Richard Villarreal, Supervisor of the Cameron County Child Welfare Unit, and they were then signed by Geraldine Simons.

On September 18, 1958, the dependency hearing was had and an order entered declaring the child dependent and neglected. The next day the child was delivered to the welfare office in Wharton, Texas, for placement in the home of the prospective adoptive parents. Also on that same day, Geraldine called Mrs. Palmer and again advised her that she wanted to keep her baby, and was advised by Mrs. Palmer that it was "too late." The next day Geraldine obtained legal advice for the first time.

On September 24, 1958, Geraldine Simons filed a motion to reopen the case and set aside the previous order. The judge set the motion for hearing on October 23, 1958. On September 27, 1958, Geraldine returned to Houston and advised Donald Martin what had happened. On October 15, 1958, Donald Martin called Geraldine at the home of Mrs. Frazier in San Benito and told her that he wanted to marry her. They then arranged for him to come down for the hearing and be married.

On October 30, 1958, Donald Martin came to Brownsville with his own mother and Mrs. Simons, Geraldine's mother, and Donald and Geraldine were married.

On October 30, 1958, an amended motion was filed in which Donald Martin joined, praying that the previous order of September 18, 1958, be set aside, and also praying that they be awarded the custody of the child. The case then became not only a motion to vacate the previous order, but also a suit for the custody of the child. After a hearing on October 31, the trial court overruled the motion and awarded custody of the child to the Cameron County Welfare Unit and its Supervisor.

At the request of appellants, the trial court filed findings of fact and conclusions of law.

The judgment of the court and the findings of fact and conclusions of law are assailed by appellants' numerous points of error, however, the decision of this case rests upon the determination of the following questions:

1. Was the decree of September 18, 1958, declaring the child dependent and neglected supported by the evidence?

2. Was the decree of October 31, 1958, overruling appellants' motion to set aside the decree of September 18, supported by the evidence?

3. Was the evidence introduced on both occasions, when taken together, sufficient to warrant the action of the court in declaring the child dependent and neglected, either on September 18, 1958, or on October 31, 1958?

4. Did the court err in placing the burden of proof on appellants to establish that the best interest of the child would be served by awarding him to their custody?

5. Did the court err in concluding that appellants failed to discharge that burden?

This proceeding, insofar as it relates to the neglected and dependent status, if any, of the child, is governed by the provisions of Articles 2330 to 2337, inclusive, Vernon's Ann.Civ.Stats. Article 2330 defines a dependent and neglected child as follows:

"The term 'dependent child' or 'neglected child' includes any child under sixteen years of age who is dependent upon the public for support or who is destitute, homeless or abandoned; or who has not proper parental care or guardianship, * * *."

Article 2331 provides for the institution of proceedings, and Article 2332 provides for the setting of the hearing, citation to the parents or guardian, etc. Article 2333 provides for the hearing, and that:

"Upon such hearing of such case the child shall be brought before said court; whereupon, the court shall investigate the facts, and ascertain whether the child is a 'dependent child,' its residence, and, as far as possible, the whereabouts of its parents or near adult relatives, when and how long the child has been maintained, in whole or in part, by private or public charity, the occupation of the parents, if living, whether they are supported by the public or have *abandoned* the child, and to ascertain, as far as possible, if the child is found dependent, the cause thereof." (Emphasis added.)

■ We now consider the first question. We have carefully examined the transcript of what occurred on such hearing, and have examined the evidence heard on motion to vacate, to determine what facts necessary to meet the requirements of the statute were not proved. The only witness heard was the welfare worker, Mrs. Palmer. The only other evidence offered was the waiver, and consent to adoption. A careful examination of the statement of facts on the original hearing demonstrates that there were no facts proved which would authorize the court to declare the child dependent or neglected.

The second hearing on the motion to set aside the decree, shows that at the first hearing the child was not brought before the court. No investigation of the facts was made to determine if the child was depend-

ent or neglected. The record on the rehearing before the court, shows that not only was there a failure to investigate the matters required by the statute, but that facts and circumstances known to appellee's agents and employees were concealed from and not made known to the court. It is undisputed that Geraldine Simons had at all times relevant, a savings account of $1,000, that she had some bonds of the value of from one hundred to two hundred dollars, besides a checking account. It is also undisputed that she told Dr. Curtis about her finances. Mrs. Palmer testified that she accompanied Geraldine when she went to cash small checks, but admitted that she made no investigation as to her finances. Geraldine also had a mother and father who were liable for her support. (She was at all times pertinent, a minor.) None of these people made any inquiry as to the ability and willingness of Geraldine's parents to help her. The facts show without contradiction, that these people, in accordance with a so-called plan of adoption, which was their idea and not hers, either at the expense of the prospective parents or with public funds, spirited Geraldine away from home and loved ones at Houston, to San Benito, where they housed her for some five months. The record further shows that she remained under the supervision of these people, confided in and relied on them during these months; and that during all this time they did not even advise her that she should inform her own mother of her condition. It is also admitted that at the very inception of the so-called plan, she told Dr. Curtis about her own finances and he said there was no need to go into her savings. "I suggested that I felt quite certain that through the prospective adoptive parents, that I could make some arrangements for some remuneration to take care of her bills that might come up during her stay." So it is evident that the mother of the child was not dependent upon public charity, and that any funds expended on her or the child was not on account of her need, but in furtherance of and to facilitate the so-called plan.

Mrs. Palmer, when asked if any investigation was made to determine if the child was dependent and neglected, replied, "I took her word for it," evidently referring to the statement in the waiver signed by Geraldine. That instrument was prepared for her to sign, and contains the language: "I further wish to state that I would like for my child to be declared a dependent and neglected child for the custody of my child to be awarded to the Cameron County Child Welfare Unit for the purpose of adoption." The instrument contains no statement by Geraldine that she had abandoned, was abandoning or would abandon the child. The statement simply is that, under the circumstances hereinafter described, she gave assent to the so-called plan.

We now come to the question of whether Geraldine had abandoned her child. This involves whether she voluntarily signed the waiver and consent to adoption, or whether her signature was procured as a result of duress.

The evidence shows that on Sunday, the day after the birth of her child, she had been refused permission to see the baby, because the nurses had been instructed that she should not be permitted to see the child because "it was up for adoption." The evidence shows that after these parties had been notified that Geraldine was not going through with the adoption plan, Mrs. Palmer called at the hospital and after a long talk with her failed to shake her determination. Then the aid of Mrs. Frazier was sought, to no avail; after which there was a chain of long-distance telephone calls, beginning with Mrs. Palmer and finally reaching Dr. Curtis, whereupon he called Geraldine and she got up out of bed and went to the telephone in the hall, and he had a "lengthy" conversation with her. We quote the Doctor's testimony:

"Q. Just tell us what happened there, please, Doctor? A. I had talked to Jerry, discussing the fact that she had changed her mind or was

pretty upset and had seen the baby and I talked to her and we had a quite lengthy conversation in which I was attempting to point out what I thought were the disadvantages of trying to make a go of this with the baby, and I recall asking her whether she had made contact with the young man and, as I recall, she hadn't. So I had assumed in my own mind that the marriage was completely out. And for that reason, I discussed at quite some length the responsibility and I did know that the prospective parents would offer the child a lot and she could count on that, of the child being taken care of very excellently. I did know the background of the parents; I knew there was absolutely no chance of their ever having any children of their own and I believe we ended up the conversation that I knew, after pointing these out, that I knew she would do the right thing for the baby and that sometimes we had to think more of someone—of the baby—than ourselves, which I brought up, I believe, in that conversation, that we are all selfish, and she agreed to that and she agreed to everything I said and I believe we ended up the conversation that I knew she was going to do the right thing by this little one and I'd sure like to hear about it about would she please call me collect and let me know about it on that occasion."

It is evident that here the doctor used the same approach as did King Solomon in Chapter Three, First Kings, to find the real mother willing to sacrifice her own feelings and rights for her child. This mother was young and inexperienced and the approach was used at a time when she was weak in body as well as troubled and distressed in mind and spirit, having been crying intermittently for three days. These same parties, Dr. Curtis and Mrs. Palmer, after Geraldine had received advice of counsel and had filed her motion to set aside the first order, sought to influence her to drop her suit and let the so-called adoption plan go through.

" 'Duress' may be defined as subjecting a person to a pressure which overcomes his will and coerces him to comply with demands to which he would not yield if acting as a free agent, or as the condition of mind produced by an improper external pressure destroying free agency so as to cause the victim to act or contract without use of his own volition." 17 C.J.S. Contracts § 168, p. 525. "Underlying all definitions of the term 'duress' is the dual concept of external pressure and internal surrender, or loss of volition in response to outside compulsion; * * *." 17 C.J.S. Contracts § 168, p. 526.

■ It is well settled that before the drastic remedy of declaring a child dependent and neglected can be applied, the unfitness of the parent or parents should clearly appear from the evidence. Poss v. Anderson, Tex.Civ.App., 188 S.W.2d 726. In Sutter v. Yutz, Tex.Civ.App., 223 S.W.2d 554, 560, the Court said:

"If a parent be unfit from misfortune or otherwise to discharge the duties and privileges conferred by parenthood, the state may intervene and terminate such rights. However, before this drastic remedy is applied, which is for the welfare of the child alone, the unfitness of the parent should clearly appear from the evidence. De Witt v. Brooks, supra [143 Tex. 122, 182 S.W.2d 687]; Cox v. Wicks, Tex.Civ.App., 210 S.W.2d 275; Fox v. Fox, Tex.Civ.App., 210 S.W.2d 622."

The facts in Pettit v. Engelking, Tex. Civ.App., 260 S.W.2d 613, 616, by this Court, opinion by Justice Norvell, are practically on all fours with the facts in this case. In the Pettit case two hearings were had. At the first hearing the mother had notice as required by statute, and the

child was declared dependent and neglected and its custody was awarded to Engelking and his wife. Twelve days thereafter the mother, Mrs. Pettit, filed a motion to reopen the case and to hear further testimony. Three days later the second hearing was had and the court overruled the motion. Judge Norvell in passing upon the proceeding, said: "We hold that in a case of this kind an order of the court reopening the case for the receipt of further testimony entered within thirty days after the rendition of the judgment has the legal effect of setting aside the judgment and rendering it ineffective." We note that in the Pettit case the trial court overruled and denied the motion to reopen the case, but considered the evidence heard in both hearings, just as the trial court did in this case.

■ Appellee seizes upon the language of the first decree in the Pettit case, to the effect that it was "subject to the further orders of this Court." We regard this as unimportant because, as said by Judge Norvell, "This is in accordance with applicable statutory provisions. Articles 2335, 2336 and 2337." Hence, it is our conclusion that the trial court in granting a hearing on the motion to reopen the case, effectively set aside the decree of September 18, 1958, but if we be mistaken in this, then, from the record before us, we conclude that the decree could not be permitted to stand on the record before the trial court at that time, for the reason that the court failed to follow the requirements of Article 2333, Vernon's Ann.Civ.Stats., and for the further reason that the evidence wholly failed to establish that the child was in fact dependent and neglected.

■ We also conclude that the evidence on either or both hearings is insufficient to warrant a judgment declaring the child dependent and neglected. The evidence shows that the mother was ready, willing and able to support and care for the child and was a fit and proper person to do so. Moreover, we are of the opinion that the trial court's finding that Geraldine Simons voluntarily surrendered the custody of the

child, and that such surrender was not induced under or by duress, was not supported by the evidence, but was contrary to the evidence when considered in the light most favorable to appellee.

■ We now come to the issue of custody of the child. It is our opinion that, inasmuch as no final judgment had been rendered legally declaring the child dependent and neglected and depriving the natural parents, Donald Martin and Geraldine Simons Martin, of the right to custody at the time they filed their pleas for custody of their child, the trial court erred in concluding that the burden of proof was upon them to establish that the minor was not dependent and neglected. Pettit v. Engelking, supra; State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901; Moran v. DeLlano, Tex.Civ.App., 323 S.W.2d 184. Moreover, we are of the opinion that from the evidence as a whole it was shown that the child was not, and had not been dependent and neglected.

■ We also conclude that the court was in error in concluding that the burden was on the parents to prove that it would be to the best interest of the child for his care and custody to be awarded to them.

■ The law is settled in this State that the natural parents of a child, as against outsiders, are entitled to the custody of their child, unless it be shown that the parental right of the parents has been terminated by decree, or the parents have voluntarily surrendered such custody, or it be shown that the parents are unfit persons to have such custody. The burden of proof is upon the outsiders to establish one or more of these facts. Arts. 2330, 2331 and 2333, supra; DeWitt v. Brooks, 143 Tex. 122, 182 S.W.2d 687; Davis v. Sears, Tex.Com.App., 35 S.W.2d 99; Moran v. DeLlano, supra; Sims v. Cole, Tex.Civ. App., 264 S.W.2d 185; Prock v. Morgan, Tex.Civ.App., 291 S.W.2d 489; Gallagher v. Die, Tex.Civ.App., 260 S.W.2d 128; Pettit v. Engelking, supra; Fox v. Fox, Tex.Civ.App., 210 S.W.2d 622; Medrano v. Rodriguez, Tex.Civ.App., 209 S.W.2d

208; Oldfield v. Lester, Tex.Civ.App., 188 S.W.2d 722.

■■ It appears from the record that Donald Martin married the mother of the child on October 30, 1958, and had theretofore and at that time acknowledged the fatherhood of the child. The child was thereby legitimated. Article 2581, Vernon's Ann.Civ.Stats., V.A.T.S. Probate Code, § 42; James v. James, Tex.Civ.App., 253 S.W. 1112. Under these circumstances the natural parents are entitled to the custody of their child, unless they are found to be unfit to have such custody. The trial court made no such finding.

■ We are of the opinion further that the trial court erred in finding that appellants failed to prove that the best interest of the child would be served by awarding its custody to them. The record shows that at the time of entry of the final judgment appellants were the parents of a legitimate child. That the father, James Donald Martin, had provided a home for his wife and child; that he had a position which paid him $350.00 per month, and that they planned to live together and provide for the child. On the other hand, appellee had placed the child in the prospective adoptive home. The record wholly fails to reveal any relevant facts from which the court could judge that home and the proposed adoptive parents. There is no evidence to show where that home is, or its size and condition. The record wholly fails to show any facts about the proposed adoptive parents. There is no evidence as to their age, condition of health, how long they have been married, or even their nationality. The only evidence with reference to the proposed adoptive home and the proposed adoptive parents is that the home has been approved as a suitable home by the appellee. We are of the opinion that the fact that appellee has approved the adoptive home amounts to no evidence. It is the province of the court, after hearing the facts, to determine the very question which was apparently determined in this case by one of the litigants. While the court has a broad discretion in the determination of the facts in a child custody case, we know of no authority for delegating that function to one of the litigants.

The judgment of the trial court is reversed and judgment here rendered that the custody of the child, James Donald Simons, be and is awarded to the parents, James Donald Martin and Geraldine Simons Martin. It appearing that the trial court awarded the care, custody and control of the child to Richard Villarreal, Supervisor, Cameron County Child Welfare Unit and his successors in office, and it further appearing that appellee has placed the custody, possession and care of the child in the proposed adoptive parents, who are not parties to this suit, and their whereabouts is unknown to this record, it is ordered that appellee secure possession of said child and forthwith deliver him to the appellants, James Donald Martin and Geraldine Simons Martin, at the Valley Baptist Hospital in Harlingen, Texas, unless a more suitable place can be agreed upon by the parties.