**W. H. GASTON et ux., Appellants,**

v.

**John C. GASTON et ux., Appellees.**

**No. 14163.**

Court of Civil Appeals of Texas.

Houston.

Oct. 10, 1963.

Rehearing Denied Nov. 7, 1963.

W. T. Bennett and Mac L. Bennett, Jr., Huntsville, for appellants.

Berry & Smither, Huntsville, and Herman H. Reynolds, Seguin, Robert B. Smither, Huntsville, of counsel, for appellees.

BELL, Chief Justice.

This case involves the question as to whether Elizabeth Gaston, a child born October 10, 1956, was a dependent and neglected child when proceedings were filed November 2, 1961, to have her so declared. Trial from which this judgment resulted was to a jury and in response to issues submitted by the court the jury found she was a dependent and neglected child; that appellants, who are the uncle and aunt of

Elizabeth, were fit and proper persons to have custody of her; that appellees, the father and mother of Elizabeth, were not fit and proper persons to have custody of her; and the custody of Elizabeth should be given appellants. The trial court overruled appellants' motion for judgment and granted appellees' motion for judgment non obstante veredicto. The court declared Elizabeth not to be a dependent and neglected child, refused to allow supersedeas of the judgment and ordered her delivered to her mother and father. After this appeal was perfected appellants filed a petition with us asking that the judgment be superseded pending determination of the appeal. We, without written opinion, after hearing oral argument and after briefs were filed, refused to disturb the trial court's action refusing to supersede the judgment. Appellants, in obedience to the order of the trial court, surrendered possession of Elizabeth and she was delivered to her mother and father.

Appellants take the position there was evidence of probative force to support the jury's determination that Elizabeth was a dependent and neglected child on November 2, 1961, and the trial court was therefore bound by such determination and could only render judgment declaring her to be a dependent and neglected child. If there is evidence of probative force to support the findings of the jury, then the trial court was in error in not entering judgment finding Elizabeth Gaston to be a dependent and neglected child.

■ In determining whether there is evidence of probative force to support a jury's findings, we must view the evidence in a light most favorable to the verdict. If, so viewing it, reasonable minds could reach the same conclusion the jury did, there is evidence to support the verdict and the court may not disregard it.

John Gaston and wife, Miriam Gaston, the mother and father of Elizabeth, were living on a 200 acre farm about seven miles out of the City of Seguin, Guadalupe Coun-

ty, in 1957. They were purchasing the farm. The father had for many years engaged in the real estate business. His work in the real estate business caused him to spend most of each day in San Antonio, Texas, which is about 35 miles from their home. We think it not material to notice appellees' activities prior to 1957 other than to note that John Gaston testified concerning his strained financial condition due to the prolonged drought which caused financial loss on the farm. Too, the real estate business had been slow. The appellees had four children. The oldest was a girl, Julia, who in 1957 was eight years old. A daughter, Isabelle, was six years old. A boy, John, was five years old. Elizabeth was about ten months old in August, 1957. Until August, 1957 the children and their mother and father were all living together on the farm.

On August 28, 1957, the mother, Miriam, was admitted to the State Hospital in San Antonio. She went there under a 90 day commitment. Her mental illness was diagnosed as schizophrenic reaction, catatonic type. She remained in the hospital until November 22. In September, 1957, the father and the children remained at their home. His mother, who was in her 70's in age, was assisting him in caring for the children. The father, at this time, was operating a hamburger stand in Seguin. Mr. W. H. Gaston, one of the appellants and a brother of John Gaston, lived in Huntsville, Texas. He was employed by the State of Texas at the State Penitentiary, being Director of Personnel and Machine Records. The mother of John and W. H. Gaston telephoned W. H. Gaston and in response to that call he and his wife, Mrs. Catherine Gaston, went to Seguin to the home of John Gaston.

There is a difference of opinion as to the exact conditions that existed in the home with regard to its cleanliness and the cleanliness of the children. It does appear, however, that it was no easy task for John Gaston to adequately care for the four children, particularly the baby, Elizabeth. It

was difficult for his elderly mother to lift the baby. Julia, who was only eight years old, helped all she could. It does appear without dispute that Elizabeth had a diaper rash. How bad it was is disputed though some evidence shows it was infected. We may assume it was. We may also assume, though it was disputed, that the children, particularly Elizabeth, were very dirty, as was the house. The W. H. Gastons, very commendably, in a desire to be of help during this trying period, wanted to take Elizabeth with them and care for her. Though John Gaston preferred to keep the children together, he consented to their taking the child to care for her until he was in a position to do so. The W. H. Gastons took the child to their home in Huntsville. There they took good care of her, including furnishing her good medical attention. They kept her until sometime in December, 1957, just before Christmas, when they took her back to Seguin at the request of John. Miriam, the mother, was at home from the hospital. There the child remained until January 26, 1958. It might be noted that the mother was at home though the doctors at the hospital felt she was unimproved and needed further treatment.

In January, 1958, Mrs. Catherine Gaston, and her daughter by a previous marriage, went by Seguin to visit the John Gastons. They had been on a trip from Huntsville to Austin and decided to return by way of Seguin. When they arrived in the home they found Elizabeth to be ill. There is a dispute as to whether her father and mother were giving her medical attention. In any event, Mrs. Catherine Gaston testified they were not and that John refused to call a doctor. John said he had previously called a doctor and gotten medicine that was prescribed and had given it to her. Mrs. Catherine Gaston prevailed on the mother and father to allow her to take all of the children, except Julia, the older one, to her home at Huntsville. Here again was a commendable effort for a brother and sister-in-law to help in a period of need. On arriving in Huntsville, med-

ical attention was immediately obtained for Elizabeth. She was hospitalized and was found to be suffering with bronchial pneumonia. About a week or ten days later, John Gaston and his wife went to Huntsville to get the children. They took two of the children home but did not take Elizabeth. There is a dispute as to what was said with regard to taking Elizabeth home. The W. H. Gaston version is that they said nothing about taking her. John Gaston's version is that they did not take her home because of her illness though she was almost recovered from pneumonia.

In June, 1958, Miriam Gaston was readmitted to the hospital and remained there until sometime in November, 1958. She was then given an indefinite furlough. While one doctor testified there was a lack of harmony between the record as to her progress and the indefinite furlough, the fact remains that the indefinite furlough was given. In 1960 a letter or certificate of discharge was given by the hospital. She had apparently not been seen since her indefinite furlough commenced and the evidence shows the letter was given since it had not been necessary for her to return. It was presumed by the hospital authorities that there was such a remission of the condition that she needed no additional treatment until there should be a recurrence of the mental condition. Since the commencement of the furlough, Mrs. Miriam Gaston has been caring for her three children who were at home.

Elizabeth continued in the home of appellants and she has been cared for by them. The appellees have contributed nothing to her support. Appellants have not asked them to do so and when the child first went with appellants, W. H. Gaston told John C. Gaston he was going to claim her as an exemption on his income tax report. He has done so each year. About the middle of 1958, when Miriam was returned to the hospital, appellants visited in San Antonio in the home of Mrs. Dickerson, a sister of John and W. H. Gaston. John Gaston was there as he was staying with

Mrs. Dickerson during the week days and working in San Antonio. He spent the weekend at home near Seguin. The record shows that on many such weekends he took Miriam on furloughs. On this visit by appellants Elizabeth was with them and John Gaston visited and played with her. A few weeks later appellants made another visit to the sister's home while John was there, but they did not bring Elizabeth with them. Mrs. Dickerson testified they told her they did not want to run into the father again while Elizabeth was with them.

In the middle of 1960 Miriam Gaston went to Huntsville to see Elizabeth, but appellants and Elizabeth were out of town according to Mrs. Catherine Gaston's daughter who was there at the home. Miriam Gaston then returned home.

Sometime after Miriam Gaston's second period of confinement commenced, appellants asked Mrs. Dickerson to determine by talking with the doctors what Miriam's chances of recovery were. They stated they thought the time had come to institute some legal proceedings in connection with custody of Elizabeth. Mrs. Dickerson talked with Dr. Moran, one of the attending doctors, who expressed the opinion her chances were excellent. She communicated this information to the W. H. Gastons together with the doctor's opinion it was important to the patient that no child be taken from her. It should also be noted that the records of the hospital and testimony of the attending physicians was that Miriam always expressed love for the children.

In August and September, 1961, Mrs. Miriam Gaston went to see a psychiatrist in Houston named Dr. Brenner. We feel his testimony shows without doubt her mental illness was certainly in what psychiatrists call "complete remission" instead of cure.

On October 30, 1961, Mrs. Miriam Gaston went to Huntsville to get Elizabeth to return her to the John Gaston home. Mrs. Catherine Gaston told her W. H. Gaston was away and she would not like to let the child go while he was away. However, Mrs. Catherine Gaston agreed she would bring Elizabeth home the next day. The child was not returned as agreed. Instead of returning the child appellants, on November 2, 1961, filed a petition in the District Court of Walker County alleging Elizabeth to be a dependent and neglected child. The bases of the contention were the circumstances of Elizabeth's illness and the condition of the John Gaston home in January, 1958, when the child was ill, as we have above set out, and the fact the child had been in appellants' home since that time and appellees had not, until October, 1961, visited the child, inquired about it or supported it. No notice was given appellees though appellants at all times knew where they lived and knew they were seeking, now that they were in a position to do so, to obtain the return of the child. Since appellees lived outside Walker County no notice is required by law. The court appointed an attorney to represent the child and, after hearing testimony, on November 3, 1961 declared Elizabeth to be a dependent and neglected child and granted custody to appellants.

As the child had not been returned as agreed, Mrs. Miriam Gaston consulted an attorney in Huntsville, who on investigation found out about the dependency proceedings. On November 9, 1961, appellees filed their petition, which they called a motion for new trial, asking the judgment of November 3 be set aside because Elizabeth was not a dependent and neglected child, and asked she be returned to them.

At the jury trial in October, 1962, in addition to what we have above recited, some of the doctors from the State Hospital testified by deposition. In addition to what we have stated concerning Miriam Gaston's mental condition, they testified giving opinions about her chances of having attacks in the future. The effect of their testimony, based on the record (they had not seen her since 1958), was that it was likely she would have attacks in the future. They refuse in cases of this type to speak of

"cure" but speak of "remission." They admit there is in many cases remission and no later attacks.

The evidence showed that appellants had no knowledge of the condition of the home since January, 1958, and did not purport to testify about it since then. The only evidence concerning the conditions since comes from appellees and Mrs. Dickerson, whose testimony shows a fit and clean home.

The evidence does show that after the visit in mid-1958 in the home of Mrs. Dickerson in San Antonio, appellees, except for the one time in 1960, and in October, 1961, did not visit Elizabeth. Neither did they contribute to her support nor make inquiries concerning her. They did not send her presents at Christmas or on her birthday or at other times. Appellants have taken good care of Elizabeth. They have furnished a good home. There is no suggestion that appellants' home is not a fit home. Appellants are to be commended for all they have done. There is no question they genuinely love Elizabeth and have her best interests at heart.

We hold, after viewing the evidence most favorably to the jury's answer finding Elizabeth to be a dependent and neglected child, that there is no evidence of probative value supporting the finding and the court did not err in disregarding it and finding she was not a dependent and neglected child.

■■ A child must in fact be dependent and neglected at the time the proceedings are instituted or be in imminent danger of becoming so. Pettit v. Engelking, 260 S.W. 2d 613, C.C.A., writ ref., n. r. e. See also Sutter v. Yutz, 223 S.W.2d 554, C.C.A., error dism.; Voigt v. Carlson, 310 S.W.2d 588, C.C.A., writ ref., n. r. e. Certainly there is no evidence that when dependency proceedings were commenced Elizabeth was destitute and without a home or was not then receiving proper parental guidance from appellants, who were for the moment in the status of loco parentis. Their home was a fine one and Elizabeth was receiving excellent care. Nor can it be said that she was in imminent danger of becoming homeless, destitute or without proper parental guidance. There was, it is true, no legal obligation on the part of appellants to continue the care they had given, but the appellees, the mother and father, were at the very time insisting on her return to them and there is no evidence that they were not then in a position to properly care for her, or that their home was not a fit and proper one. The child was not dependent on the public for support. Whatever might have been the state of affairs in January, 1958, when the child was taken from the home, the same conditions did not exist when the dependency proceedings were filed and the hearing held.

This case is unlike Bee v. Robbins, 303 S.W.2d 827, C.C.A., no writ history, which is so heavily relied on by appellants. There the child's mother was dead. The father was serving a 50 year term in the penitentiary for murder. The relatives to whom the father had surrendered possession so it would be taken care of were taking care of the child but were under no legal obligation to do so. However, there, if the relatives ceased to do so there would be no family to care for it. It was thus in imminent danger of becoming a dependent and neglected child through want of proper parental guidance.

What appellants really rely on to show dependency is abandonment. They seek to have this inferred from the fact that appellees did not support the child from 1958 to October, 1961, nor offer to do so, and with the two exceptions above mentioned did not inquire about the child. These facts alone are not determinative. Certainly the undisputed evidence shows that appellants knew when they first got the child in September, 1957, that appellees were in hard circumstances and they wanted to help out. Appellees did not want the child to go but finally consented if appellants would agree to return it upon request. While appel-

lants deny such agreement, they in fact did return the child in December as requested. In January, 1958, when the child was taken with the consent of appellees, though they reluctantly agreed to it, it was again done by appellants to help appellees because of the difficult circumstances. As W. H. Gaston testified on trial, when he took the child it was the doing of a brotherly act. When asked when it ceased to be a brotherly act, he answered it had not ceased to be one.

Unquestionably the evidence fails to show that appellees abandoned the child and left it to public charity and ceased to be concerned with its welfare. Appellants at all times knew where appellees were. They never called on appellees for any support or sought to return the child. Appellees knew the appellants had a good home; they knew W. H. Gaston had an honorable and responsible position; they knew appellants were taking an income tax deduction that was more advantageous in the light of their relative incomes and number of dependents. Too, Mrs. Miriam Gaston's illness was of a nature that the passage of time would tell whether a recurrence was likely. John Gaston had a right, under all circumstances, to believe the child was being well cared for by his brother and if the brother felt he should or could no longer care for the child he would get in touch with him.

This case is distinguishable from De Witt v. Brooks, 143 Tex. 122, 182 S.W.2d 687, and Thomson v. Harrell, 271 S.W.2d 724, C.C.A., no writ history. In those cases the parents had in effect left the children for the public to support and had gone off to other states and, at the time of the declaration of dependency, the parents' whereabouts were unknown. Too, adoption of the children had followed in each case. In each case the parents learned the facts shortly after declaration of dependency and adoption and in each instance waited several years thereafter before taking any action. In the Thomson case there was never a suit seeking to set aside the judgment

finding the child to be dependent and neglected.

There is no evidence supporting the finding that appellees were not fit and proper persons to have custody of their child. It belongs, as a matter of law, under the facts shown in this case, with its mother and father and brother and sisters.

The judgment of the trial court is affirmed.