v.

**The STATE of Texas, Appellee.**

No. 16478.

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 17, 1975.

Rehearing Denied Aug. 14, 1975.

On Motions for Rehearing

Bounds, Fitzgerald, McGilvray & Grimm, Martin J. Grimm, Houston Legal Foundation, Ronnie E. Bounds, Jr., Ronald G. Fitzgerald, James L. McGilvray, Houston, for appellant.

Carol S. Vance, Dist. Atty., Joseph T. Terracina, Chris Hanger, Kay L. Burkhalter, Asst. Dist. Attys., Houston, for appellee.

PEDEN, Justice.

Our opinion filed on May 1, 1975, in this cause is withdrawn and the opinion that follows is substituted for it.

This suit was brought by the State to have an infant girl declared dependent and neglected, to terminate parental rights, and to place her with Harris County Child Welfare Unit as managing conservator with authority to place her for adoption. The mother appeals from a judgment in favor of the State entered after a non-jury trial.

Appellant complains that there was no evidence to sustain the trial court's finding that termination of her parental rights would be in the best interest of the child and says that such finding was so against the great weight of the evidence as to be clearly wrong. No findings of fact or conclusions of law were requested or filed in this case. In determining "no evidence" points of error we view the record in the light most favorably in support of the findings of the trial court. *Fisher Construction Co. v. Riggs*, 160 Tex. 23, 325 S.W.2d 126 (1959). Great weight points require us to consider all the evidence.

The court's "paramount concern is with the best interests of the children. . . . There is a presumption that the interests of a young child are best served by award of its custody to its natural parents. The presumption is based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible. . ." *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex. 1963).

The burden of proof on the issue of the best interest of the child is upon the one seeking to deprive the natural parent of custody. *Herrera v. Herrera*, 409 S.W.2d

395, 396 (Tex.1966). Before the drastic remedy of declaring a child dependent and neglected can be applied, the unfitness of the parent should clearly appear from the evidence. *Martin v. Cameron County Child Welfare Unit,* 326 S.W.2d 31, 36 (Tex.Civ. App.1959, writ ref'd n. r. e.). The evidence must be clear and convincing to give custody to another who is not the natural parent. *Calhoun v. Ruffer,* 425 S.W.2d 50 (Tex.Civ. App.1968, no writ). The evidence in the record authorizes the trial court to measure the appellant's future conduct by her recent deliberate past conduct as it may be related to the same or a similar situation. *De Llano v. Moran,* 160 Tex. 490, 333 S.W.2d 359, 361 (1960).

We review all the evidence. The appellant, D—— F——, was called as an adverse witness. She is 19 years old and is the mother of T—— F——, an infant born on October 21, 1973. The father is H—— B——, Jr. She has never been married to him and she only lived with him for about a month. He has never contributed to the baby's support. At the time of trial, September 18, 1974, she had had six or seven jobs in the last nine months, working two or three weeks at each, and had lived in six different places. She was living with James Thompson when her daugher was placed in foster care. He had been put in jail and she had gone to see him when she was picked up by the police. She had just gotten over pneumonia. She lived with David Thomas for about six months, but is no longer doing so. They plan to marry.

She said she has been in Rusk State Hospital because her father beat her up and she thought she needed a rest. She stayed four days once and eight days the other time. She said she had a nervous breakdown the second time. She went there a third time and stayed three months. Her health is now excellent.

She plans to finish Career Academy, where she is studying to be a dental assistant, in six more months. She has been there three weeks. She is supposed to get food stamps right away. She said she works about three days a week and makes $35 from Mrs. Elnora Thomas, but she has no income now and no money in the bank. She borrowed $100 from Mrs. Thomas. She spent $45 of it to get into school and paid a $50 deposit on her apartment. Her rent is $140 per month. David Thomas' sister is helping her out with food until she can get food stamps.

If her daughter is returned to her she plans to continue in the academy, where she will attend from eight until one, then work from two until eight or ten. One of David's sisters will keep the appellant's daughter while the appellant works and goes to the academy. She would be with her daughter on weekends and would later get a nine-to-five job.

Appellant admitted she had sometimes left her baby alone for a long time. She said she didn't know what to do with her baby, since she had not had one before and didn't have any kind of help. She couldn't recall having been referred to Jeff Davis for child-rearing classes, but would be willing to do anything she was asked to do. She admitted refusing to cooperate with the Child Welfare Unit in some things but said she has been to the Family Service Bureau five or six times. She denied leaving her baby alone longer than about ten minutes. Mrs. Price's daughter wanted her baby, but she refused and they kept bothering her.

Appellant said the apartment she lived in with James Thompson was junky, but not dirty. She had just gotten over pneumonia and was sick and weak. She thinks she can give her baby security, love and a good home, the most important things to her, by staying in school and getting a good job. She said she would die and go to hell for her baby; that she may have been immature, but she thinks she has learned from her experience and should be given a second chance.

She testified that she has a job where she can start tomorrow, making $3 an hour. Mrs. Thomas will help her get furniture for her apartment. After five months' more training she will be able to earn $500 to $600 per month. She said she has not missed a visit with her child. Her child is clean and healthy at present but cries during each visit. Admitting that in less than four weeks at the academy she has missed four or five days, she explained that she had to find an apartment, find a lawyer, and come to court.

Concerning her condition when she and her child were picked up by the police, she testified:

"Q. Do you recall Officer Craddock of the Houston Police Department coming up to assist you at that time?

"A. All I remember was that this young white man came up and asked me if I was hurt, and he had this lady with him, and I said no, I was just weak because I hadn't eaten, and I asked him would they carry me home, and the lady didn't know where this place was, and she stopped a policeman, and I was real upset, so he carried me to the Police Station and they took the baby, because she was sick. Her milk had soured on her and I didn't know it. I know that was kind of dumb not to check the milk and everything, because it could have messed up her health.

"Q. Do you recall that T———— was vomiting and had diarrhea at that time?

"A. Yes. I had been trying to feed her, you know, and I had asked that lady that had checked the baby at the hospital if I could feed her baby food and the baby food, I guess it hadn't adjusted to her stomach, but her milk had soured, but I didn't know it."

Officer Craddock testified that he was in the 1200 block of Congress across the street from the Courthouse when it was brought to his attention that "the woman was in a bad way and had a small baby with her." He said when he first saw relator she was on the sidewalk sitting down on the curb and had a baby in her arms. He described her condition as:

"Well, the baby seemed . . . well, the baby had . . . the mother was carrying a little bottle of milk. It must have had about a third of the milk in it was left in there, and the milk had . . . I looked inside, because the nipple had kind of gotten stuck together, and as I looked inside the bottle, I noticed that the milk inside the bottle had clabbered. It was, you know, that old. And the baby's diapers were pretty dirty. In fact, them diapers was hard, they had been on the diaper so long.

"Q. It had crusted up?

"A. Yes, sir. Sure had. And this was what prompted my attention. I talked to the mother about it, and she couldn't seem to come up with any kind of particular answers as to where she lived and you asked her her name and she hesitated and asked her why she was up in this vicinity and she said she had been up to see a boy friend of hers in the County Jail at that time."

Mrs. Sandra Price, the owner of an apartment building in which appellant had lived with several different tenants, testified that she knows the child was left alone for four hours on one occasion in November, 1973. When appellant moved in with one James Thompson the apartment was a total wreck; it was filthy, with dirty diapers and dirty clothes all over the place. Mrs. Price called Child Welfare because of complaints from her tenants about the baby's being left alone.

Mr. Wm. Eignus, a Welfare worker, testified that when he visited the apartment

where appellant was living he found it in disarray, with piles of clothing on the floor and the odor of soured milk in the air. The oven was on, and the handle of a fork in the oven had melted.

He discussed with the appellant the possibility of her getting her baby back and told her that she would need to show some stability as to a place to live, income from Welfare or a job and to show that she was able to take care of the child herself. She said she would do what was needed, and he gave her a list of places where she might get help for herself and training in child care. She contacted those places but did not follow through on any of the programs he suggested. He said that during the past year she had introduced him to three men she had been living with at different times during the year, referring to each as her fiancé. He found a good deal of the baby food had been left open on the counter and had spoiled. He didn't consider that the baby could have been adequately fed and cared for in view of the lack of cleanliness he found.

Dr. Ken Vincent, a clinical psychologist, testified that he had given the appellant five psychological tests in March of 1974. As a result, his opinion is that she is in the range of dull normal intelligence, is immature, her ego development is below normal, she is at odds with herself and society, and is not apt to follow through with long-range goals. She has deep-seated unresolved dependency needs and her life script is self-defeating and destructive. It is his opinion that she is quite manipulative and that her sexual acting out of her current life style is unconsciously directed at getting back at her parents, as is her desire to keep her child. She is also motivated by her desire to have a devoted love object of her own. He did not feel qualified to judge whether she could adequately perform the tasks of a mother.

Carol Linda Proctor of Harris County Child Welfare Unit testified that the appellant's case was assigned to her from December of 1973 until May of 1974, during which time she had many contacts with the appellant. She advised the appellant that she needed to find some place to stay and to stay there, to get a job or job training, and to get counseling. Appellant was referred to vocational rehabilitation therapy in December and went there once but did not go back until March of 1974. She made no effort to cooperate and never followed any suggestions. She had six places of residence. She would wait until a court appearance was coming up before she would do anything. She would not follow through with anything she started. She finally got into job training, lasted two or three weeks, then dropped out. She is back in job training now. She was referred to two places where she would be trained to care for her child and get help for her own personal problems, but she didn't follow through. The child cried the whole time when the mother came to visit her but did not do so with others.

Mr. Trent Piper, a counselor for Texas Rehabilitation Commission, said the appellant applied with the agency twice in 1973. He got her a job interview. She was offered counseling and guidance, and an opportunity to work with them to let them help her set up goals toward stable employment, but she didn't cooperate or follow through on any of their suggestions. She was to let him know on the following day how her job interview came out, but he didn't hear from her until just before this hearing.

Karen Nelson of Harris County Child Welfare Unit testified that she has been assigned to this case since June 12, 1974. The appellant was then in job training, but she dropped out five days later. When it was necessary during the appellant's visits with her daughter, she was told to change her or clean her up, but Miss Nelson usually ended up doing it. Miss Nelson recommends that parental rights be terminated.

Since the child has been in foster care the appellant has seen the child once a month.

Mrs. Elnora Thomas was called as a witness by the appellant. She has known the appellant for about six months. Mrs. Thomas owns a thrift shop and lives about a block from the appellant, whom she has been helping to get employment, an apartment, and furniture. She would help the appellant any way she could as long as the appellant shows she is trying. She feels that the appellant is trying to straighten her life out. Mrs. Thomas has made arrangements with her daughter to look after the appellant's baby while the appellant is at school and work.

Her son David, who is twenty, and the appellant were talking about getting married about a month ago but haven't mentioned it lately. Mrs. Thomas said that during a visit with T—— F—— she thought the appellant handled her child like any mother would. She handles Mrs. Thomas' daughter's children well, feeds and changes them.

The appellant was called back to the witness stand. She said that when she was pregnant and shortly thereafter there was nobody she could go to for help. She tried to get her parents to help, but they wouldn't. Mrs. Thomas and her daughter and son would help her now, and with their help she can care for the child. She will do anything that will help. She will complete the dental assistant's training and try to make the best grades she can, because her whole life depends on it. She has a high school equivalency diploma.

She plans to marry David Thomas, maybe in six months or a year, when she gets financially able and through with school. They were thinking about living together, but she told him it would mess up her child's life, and it would be better if they got married. She had left her daughter with a baby sitter the time she was alone for several hours. She said the baby sitter must have left.

■ No other evidence was offered. A copy of the report of a social study authorized by Section 11.12 of the Family Code, V.T.C.A., is in the transcript of this appeal, but it was never introduced in evidence in the trial court. Section 11.12 states that the report shall be made part of the record of the suit, but Sections 11.14 and 11.15 state that the rules of evidence apply as in other civil cases and that the trial court's finding shall be based on a preponderance of the evidence under rules generally applicable to civil cases. For these reasons and for others stated in our opinion filed on May 1, 1975, in *Magallon v. State,* we hold that the report was not properly before the trial court. A number of the persons whose impressions were noted in the report testified in the trial in this case.

The provisions of Section 15.02 of the Family Code which are applicable to the facts developed in this case state that a petition requesting termination of the parent-child relationship, with respect to a parent who is not the petitioner, may be granted if the court finds:

"(1) the parent has   .   .   .

(D) engaged   in   conduct   .   .   . which endangers the physical or emotional well-being of the child;   .   .   . and

"(2) termination is in the best interest of the child."

■ The evidence as to the condition in which the child was found when she was taken from the appellant supports the trial court's presumed finding that the appellant had engaged in conduct which endangers the child's physical well-being. The appellant explained that she had been ill, but we hold that the trial court was warranted in presumably finding that her physical condition as well as that of her child and of her living quarters were the result of her own neglect and not of some cause over which she had no control.

■ The trial court was not required to accept the truth or accuracy of appellant's

testimony, either as to her past actions or her future intentions. The testimony of other witnesses and inconsistencies in her own testimony tended to create a doubt as to the truth of her statements.

We do not suggest that the courts should terminate the parent-child relationship when the parent through lack of intelligence or training, illness, or misfortune is unable to provide a desirable degree of physical care and support for his or her children. Where love and affection exist between a parent and child some lack of material comforts is not, in our opinion, detrimental to the child's well-being, but a lack of adequate love and affection may be evidenced by the parent's deliberate neglect in failing to provide a reasonable measure of care and comfort for the child. The trial court was entitled to accept the psychologist's opinion testimony suggesting that the appellant wants to keep her baby to get back at her parents, to use as a symbol of personal accomplishment, and as a means of providing a feeling of love to herself. In this case the trial court could have concluded that the parent's conduct indicated deliberate neglect and lack of care for the child, so an alternative rearing situation would be a much preferable solution.

We can only speculate as to the factors which the trial judge determined to be most important, influenced his decision, and formed the basis of his judgment. No findings of fact were requested or made to guide us in our review. The trial judge had an opportunity to view the demeanor of the appellant during trial and to weigh her testimony in the light of human experience and the testimony of the other witnesses. He could have concluded from the evidence that the appellant's conduct demonstrated a basic lack of care and affection for the child and this lack would probably continue to be demonstrated in her future conduct. Further, that the appellant's "recent deliberate conduct" demonstrated she would probably not muster the determination and persist-

ence to obtain and hold a job necessary for her self-support and the care of her child. Standing alone, this latter factor would not suffice as a ground for termination of the parent-child relationship. Presumably, under Sec. 15.02, a parent may elect not to work at all and to provide subsistence for his family from welfare. However, in deciding whether termination is in the best interest of the child, a court may consider whether the failure of a parent to gain and hold steady employment demonstrates an emotional weakness and instability.

We hold that the evidence supports the trial court's presumed finding that the appellant has engaged in conduct which has had and will have a detrimental effect upon the physical and emotional well-being of the child, as demonstrated by her recent past conduct, and that it would be in the best interest of the child to terminate the parent-child relationship.

We will notice the appellant's other points of error.

In her eighth point she complains of an irreconcilable conflict between the State's pleadings and the judgment. This suit was filed before January 1, 1974, the effective date of Title 2 of the Texas Family Code, but the State's petition was amended and this cause was tried after that date. Appellant says the State's second amended petition seeks relief provided in Title 2 of the Family Code, termination of parental rights and appointment of a managing conservator with authority to place the child for adoption, but alleges dependency and neglect under the old Articles 2330–2337, Vernon's Ann.Texas Civil Statutes. It is true that the allegations follow the provisions of the prior statutes rather than those of Section 11.08 of the Family Code, but they were not excepted to or pointed out by written motion before rendition of judgment, so this defect in pleading was deemed waived under Rule 90, Texas Rules of Civil Procedure. In determining child custody

cases the technical rules of pleading and practice need not be strictly followed. It is the best interests of the child that are paramount. *Hendrick v. Voss,* 334 S.W.2d 308 (Tex.Civ.App.1960, no writ); *Ex Parte Gallop,* 486 S.W.2d 836 (Tex.Civ.App.1973, ref'd n. r. e.).

Apparently this case was tried under the Family Code, Title 2. Section 4 of the enactment provision of Title 2 states that all proceedings in actions pending on January 1, 1974 shall be governed by Title 2 of the Code "except to the extent that in the opinion of the court its application in an action pending when this act takes effect would not be feasible or would work injustice." We find no indication that the trial court was of such opinion.

■ Appellant attempts to raise "no evidence" and "insufficient evidence" points as to the termination of the natural father's rights, but the appellant has no standing to assert these points of error as neither the appellant nor her counsel represents the natural father. He was served with citation but did not appear to contest the matter. He is married and lives in Palestine, Texas.

■ Appellant further complains that in effect the trial court denied appellant her right to counsel, which was a denial of due process and equal protection, by allowing the attorney of record to withdraw one day prior to the trial date and not granting appellant's new counsel a continuance, alleging that he had but one day to prepare for trial of the case. We overrule this point. Appellant's attorney failed to comply with the requirements of Rules 251–253, Texas Rules of Civil Procedure, in that no written motion for continuance pointing out sufficient cause supported by affidavit was ever filed, only an unsworn oral motion for continuance made on the date of trial. If an application for continuance does not conform to the provisions of a statute or rule regulating continuances, the granting

of relief is within the sound discretion of the trial court. It will be presumed, in the absence of a showing to the contrary, that the court has not abused its discretion. *Watson v. Godwin,* 425 S.W.2d 424 (Tex.Civ. App.—Amarillo 1968, ref'd n. r. e.).

■ Appellant's ninth point of error contends that Sec. 15.02(2) of the Texas Family Code is unconstitutional because it is vague and overly broad. As we have noticed, Section 15.02 requires that there be findings under both sub-section (1) and subsection (2) before termination may be granted. We find no merit in this point.

The judgment of the trial court is affirmed.