# Supreme Court of Texas

No. 23-0697

State of Texas; Office of the Attorney General of the
State of Texas; Texas Medical Board; Texas Health and Human
Services Commission; and Ken Paxton, in his official capacity as
Attorney General of the State of Texas,

*Appellants*,

v.

Lazaro Loe, individually and as next friend of Luna Loe, a minor;
Mary Moe and Matthew Moe, individually and as next friends of
Maeve Moe, a minor; Nora Noe, individually and as next friend of
Nathan Noe, a minor; Sarah Soe and Steven Soe, individually
and as next friends of Samantha Soe, a minor; Gina Goe,
individually and as next friend of Grayson Goe, a minor;
PFLAG, Inc.; Richard Ogden Roberts III, M.D.; David L. Paul,
M.D.; Patrick W. O'Malley, M.D.; and American Association of
Physicians for Human Rights, Inc. d/b/a GLMA: Health
Professionals Advancing LGBTQ Equality,

*Appellees*

On Direct Appeal from the
201st District Court, Travis County, Texas

**Argued January 30, 2024**

JUSTICE HUDDLE delivered the opinion of the Court, in which Chief Justice Hecht, Justice Boyd, Justice Devine, Justice Blacklock, Justice Busby, Justice Bland, and Justice Young joined.

JUSTICE BLACKLOCK filed a concurring opinion, in which Justice Devine joined.

JUSTICE BUSBY filed a concurring opinion.

JUSTICE YOUNG filed a concurring opinion.

JUSTICE LEHRMANN filed a dissenting opinion.

A new law prohibits certain medical treatments for children if administered "[f]or the purpose of transitioning a child's biological sex" or "affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." TEX. HEALTH & SAFETY CODE § 161.702. Before it took effect on September 1, 2023, several parents of children with gender dysphoria,[1] together with physicians and groups that would be affected by the law, sued to enjoin its enforcement, alleging that it is facially unconstitutional. The trial court concluded that the law likely violates the Texas Constitution, and it temporarily enjoined the law's enforcement.

On direct appeal of the temporary injunction, we do not attempt to identify the most appropriate treatment for a child suffering from gender dysphoria. That is a complicated question hotly debated by medical experts and policy makers throughout this country and the

---

[1] According to the American Psychiatric Association, gender dysphoria is the psychological distress that results from an incongruence of at least six months' duration between one's sex at birth and one's gender identity. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FIFTH EDITION, TEXT REVISION 511–12 (2022).

world.[2]  And, to be sure, neither this Court nor any party to this proceeding suggests that children suffering from gender dysphoria are undeserving of treatment and support.  The reverse is obviously true: they, like all children, deserve the most appropriate treatment together with support, love, and empathy.  We emphasize, though, that the only

[2] As of June 2024, at least twenty other states have enacted restrictions on both surgical and nonsurgical treatments for minors similar to those in Texas.  *See* ALA. CODE § 26-26-4; ARK. CODE § 20-9-1502; FLA. STAT. § 456.52; GA. CODE § 31-7-3.5; IDAHO CODE § 18-1506C; IND. CODE § 25-1-22-13; IOWA CODE § 147.164; KY. REV. STAT. § 311.372; LA. STAT. § 40:1098.2; MISS. CODE § 41-141-5; MO. REV. STAT. § 191.1720; MONT. CODE § 50-4-1004; N.C. GEN. STAT. § 90-21.151; N.D. CENT. CODE § 12.1-36.1-02; OHIO REV. CODE § 3129.02; OKLA. STAT. tit. 63, § 2607.1; S.C. CODE § 44-42-320; S.D. CODIFIED LAWS § 34-24-34; TENN. CODE § 68-33-103; WYO. STAT. § 35-4-1001.  At least four additional states have enacted laws that prohibit surgical procedures but not all nonsurgical treatments.  *See* ARIZ. REV. STAT. § 32-3230; NEB. REV. STAT. § 71-7304; UTAH CODE § 58-68-502(1)(g); W. VA. CODE § 30-3-20.  Conversely, at least fourteen states, either by statute or executive order, provide various protections for those seeking or providing medical treatment for gender dysphoria.  *See* CAL. PENAL CODE § 819; COLO. REV. STAT. § 12-30-121(2); CONN. GEN. STAT. §§ 52-571n(b), 54-155b; 735 ILL. COMP. STAT. 40/28-20; ME. STAT. tit. 22, § 1508; Md. Exec. Order 01.01.2023.08 (2023); MASS. GEN. LAWS ch. 12, § 11I 1/2(b); MINN. STAT. § 260.925; N.J. Exec. Order No. 326 (2023); N.M. STAT. § 24-34-3; N.Y. EDUC. LAW § 6531-b(2); OR. REV. STAT. § 414.769(3); VT. STAT. tit. 15, § 1152(a); WASH. REV. CODE §§ 7.115.020, .040.

In March of this year, England's National Health Service announced it would limit the use of puberty suppressing hormones for children, concluding that "there is not enough evidence to support the safety or clinical effectiveness of [puberty suppressing hormones] to make the treatment routinely available at this time."  NHS ENGLAND, CLINICAL POLICY: PUBERTY SUPPRESSING HORMONES (PSH) FOR CHILDREN AND YOUNG PEOPLE WHO HAVE GENDER INCONGRUENCE/GENDER DYSPHORIA 3 (Mar. 12, 2024).  And the health agencies in at least four other European nations have recently revised their health policies to restrict hormone treatments for children.  *See* Azeen Ghorayshi, *Youth Gender Medications Limited in England, Part of Big Shift in Europe*, N.Y. TIMES, Apr. 9, 2024 (describing restrictions recently implemented or adopted in Finland, Sweden, Norway, and Denmark).

question we are called upon to answer is a distinctly legal one: whether plaintiffs in this case have established a probable right to relief on their claims that the Legislature's prohibition of certain treatments for children suffering from gender dysphoria violates the Texas Constitution.

We conclude that plaintiffs failed to meet that burden. We have said—and we reaffirm today—that fit parents have a fundamental interest in directing the care, custody, and control of their children free from government interference. But we have never defined the source or precise scope of this interest, and our precedents make clear that this interest is not absolute. Indeed, we have never held that a fit parent's interest in caring for her child free from government interference, though weighty, triggers heightened scrutiny of every statute that restricts any asserted right connected to that interest. When developments in our society raise new and previously unconsidered questions about the appropriate line between parental autonomy on the one hand and the Legislature's authority to regulate the practice of medicine on the other, our Constitution does not render the Legislature powerless to provide answers.

For the reasons explained below, we conclude the Legislature made a permissible, rational policy choice to limit the types of available medical procedures for children, particularly in light of the relative nascency of both gender dysphoria and its various modes of treatment and the Legislature's express constitutional authority to regulate the practice of medicine. We therefore conclude the statute does not unconstitutionally deprive parents of their rights or physicians or health

4

care providers of an alleged property right in their medical licenses or claimed right to occupational freedom. We also conclude the law does not unconstitutionally deny or abridge equality under the law because of sex or any other characteristic asserted by plaintiffs. We therefore reverse and vacate the trial court's order.

## I. Background

In 2023, the Legislature enacted Senate Bill 14, captioned a statute "relating to prohibitions on the provision to certain children of procedures and treatments for gender transitioning, gender reassignment, or gender dysphoria." Act of May 17, 2023, 88th Leg., R.S., ch. 335.[3] S.B. 14 primarily modifies Chapter 161 of the Health and Safety Code by adding a new Subchapter X addressing "Gender Transitioning and Gender Reassignment Procedures and Treatments for Certain Children." *Id.* § 2. The statute prohibits a physician[4] or health care provider[5] from performing certain actions on a child[6] when those actions are performed for one of two purposes: (1) "transitioning a

---

[3] S.B. 14 received roughly sixty percent approval in both chambers of the Legislature. *See* Act of May 17, 2023 (noting that the bill was approved in the Senate by a vote of 19–12 and in the House by a vote of 87–56 with two present members not voting). It was signed by the Governor on June 2 and took effect on September 1, 2023. *Id.* § 9.

[4] "Physician" is defined as "a person licensed to practice medicine in this state." TEX. HEALTH & SAFETY CODE § 161.701(4).

[5] "Health care provider" is defined as "a person other than a physician who is licensed, certified, or otherwise authorized by this state's laws to provide or render health care or to dispense or prescribe a prescription drug in the ordinary course of business or practice of a profession." TEX. HEALTH & SAFETY CODE § 161.701(2).

[6] "Child" is defined as "an individual who is younger than 18 years of age." TEX. HEALTH & SAFETY CODE § 161.701(1).

child's biological sex as determined by the sex organs, chromosomes, and endogenous profiles of the child"; or (2) "affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." TEX. HEALTH & SAFETY CODE § 161.702. The statute identifies three forms of prohibited surgical intervention: (1) "a surgery that sterilizes the child"; (2) "a mastectomy"; and (3) removal of "any otherwise healthy or non-diseased body part or tissue." *Id.* § 161.702(1), (2), (4). The statute also prohibits providing, prescribing, administering, or dispensing the following prescription drugs: (1) "puberty suppression or blocking prescription drugs to stop or delay normal puberty"; (2) "supraphysiologic doses of testosterone to females"; and (3) "supraphysiologic doses of estrogen to males." *Id.* § 161.702(3).[7]

There are two exceptions. First, "with the consent of the child's parent or legal guardian," the prohibitions in Section 161.702 do not apply to (1) prescription drugs that suppress or block puberty "for the purpose of normalizing puberty for a minor experiencing precocious puberty" or (2) "appropriate and medically necessary procedures or treatments" for a child that either "is born with a medically verifiable genetic disorder of sex development" or "does not have the normal sex chromosome structure for male or female as determined by a physician through genetic testing." *Id.* § 161.703(a). Second, the statute's prohibition against certain prescription drugs does not apply if that drug is "part of a continuing course of treatment that the child began before

---

[7] "Supraphysiologic" means "greater than normally present in the body." *Supraphysiological*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/medical/supraphysiologic.

June 1, 2023," and "the child attended 12 or more sessions of mental health counseling or psychotherapy during a period of at least six months" before treatment began. *Id.* § 161.703(b). However, the statute limits this second exception: the child "shall wean off the prescription drug over a period of time and in a manner that is safe and medically appropriate and that minimizes the risk of complications," and the child may not switch to another prohibited prescription drug or treatment. *Id.* § 161.703(c).

S.B. 14 also amends Section 164.052(a) of the Occupations Code to add violations of Health and Safety Code Section 161.702 to a list of over twenty "prohibited practice[s]" by a physician. *See* TEX. OCC. CODE § 164.052(a)(24). And it adds Occupations Code Section 164.0552, which requires the Texas Medical Board to revoke a physician's "license or other authorization to practice medicine" for violating Section 161.702. *Id.* § 164.0552(a). The statute expressly makes both changes to the Occupations Code applicable only to conduct that occurs on or after S.B. 14's effective date. *See* Act of May 17, 2023, § 6. Finally, the statute provides that a state-provided child health plan for low-income, uninsured children under Chapter 62 of the Health and Safety Code may not provide coverage for the services prohibited by Section 161.702. *See* TEX. HEALTH & SAFETY CODE § 62.151(g).

A few weeks before S.B. 14 took effect, several plaintiffs sued in Travis County District Court, seeking a declaration that the statute is "unconstitutional, void, and unenforceable in its entirety." They also sought temporary and permanent injunctions prohibiting the statute's implementation or enforcement.

7

Among the plaintiffs are the parents of five children between the ages of nine and sixteen. Each alleges that his or her child has been diagnosed with gender dysphoria and, in consultation with a physician, either started or planned to start a course of treatment prohibited by the statute, as follows:

- Luna Loe,[8] age twelve, and Samantha Soe, age fifteen, had been taking puberty blockers before S.B. 14 took effect.

- Nathan Noe, age sixteen, and Grayson Goe, age fifteen, had been taking testosterone, and Samantha had been taking estradiol.[9]

- Maeve Moe, age nine, intends to take puberty blockers when she reaches puberty.

Three licensed Texas physicians—Dr. Richard Ogdon Roberts III, Dr. David L. Paul, and Dr. Patrick W. O'Malley—are also plaintiffs. They allege that, but for S.B. 14, they would continue to treat their underage gender dysphoria patients by performing the procedures and treatments the statute prohibits if called for by the generally accepted standard of care. The remaining plaintiffs are two organizations that advocate for LGBTQ+ rights: PFLAG, Inc.; and the American Association of Physicians for Human Rights, Inc. d/b/a GLMA.

The defendants in this suit are the State of Texas; the Office of the Attorney General; Ken Paxton, in his official capacity as Attorney

---

[8] By agreement of the parties, the minor plaintiffs and their parents were permitted to proceed in all public filings under pseudonyms.

[9] Testosterone is a hormone that stimulates development of male sex characteristics, and estradiol is an estrogen hormone that stimulates development of female sex characteristics.

General[10]; the Texas Medical Board; and the Texas Health and Human Services Commission. They jointly filed a plea to the jurisdiction and a response to plaintiffs' application for a temporary injunction, arguing, among other things, that plaintiffs' constitutional claims were facially invalid.

The trial court conducted a two-day evidentiary hearing. Following the hearing, it entered a temporary injunction immediately enjoining all defendants from enforcing S.B. 14, based on the following findings:

(1) the statute "likely violates Article I, Section 19 of the Texas Constitution by infringing upon the fundamental right of parents to make decisions concerning the care, custody, and control of their children";

(2) the statute "likely violates Article I, Section 19 of the Texas Constitution by infringing upon Texas physicians' right of occupational freedom"; and

(3) the statute "likely violates Article I, Sections 3 and 3a [of] the Texas Constitution by discriminating against transgender adolescents with gender dysphoria because of their sex, sex stereotypes, and transgender status."

Because the trial court granted a temporary injunction based on its conclusion that S.B. 14 likely violates the Texas Constitution, defendants appealed the order directly to this Court. *See* TEX. GOV'T

---

[10] At the time suit was filed, John Scott was serving as Provisional Attorney General during Ken Paxton's mandatory suspension from office. *See* TEX. CONST. art. XV, § 5. Plaintiffs' suit originally named Scott in his official capacity as Provisional Attorney General. By the time the temporary injunction was issued, Scott had been replaced as Provisional Attorney General by Angela Colmenero. While this appeal was pending, Paxton was reinstated as Attorney General.

CODE § 22.001(c) ("An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state."). We noted probable jurisdiction and set the appeal for oral argument.

## II. Standing

We begin by evaluating our jurisdiction. *See Tex. Propane Gas Ass'n v. City of Houston*, 622 S.W.3d 791, 797 (Tex. 2021) ("[S]ubject-matter jurisdiction must exist before we can consider the merits, . . . and 'we have an obligation to examine our jurisdiction any time it is in doubt.'" (quoting *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020))). If plaintiffs lack standing to assert their claim, a "court has no jurisdiction over [the] claim." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). But we need not undertake a plaintiff-by-plaintiff analysis on the question because the existence of one plaintiff with standing is sufficient to confer jurisdiction in suits seeking to enjoin enforcement of a law. *See State v. Zurawski*, ___ S.W.3d ___, 2024 WL 2787913, at *6 (Tex. May 31, 2024).

The first set of plaintiffs are parents suing individually and on behalf of their children. They allege S.B. 14 infringes on their right to make medical decisions for their children and unconstitutionally discriminates against their children for being transgender. At least some of these parents allege that their children were previously receiving treatments that the statute now prohibits and that they would resume those treatments if this suit were successful. Defendants do not argue that these parents have not alleged an injury in fact or that the

10

relief they seek would not provide redress. Whatever their claims' ultimate merits, the parents have concretely alleged that S.B. 14 prevents them and their children from engaging in constitutionally protected conduct they would continue to engage in but for the statute. Those allegations are sufficient to establish those parents' standing. *See Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) ("Constitutional standing requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order.").

The plaintiffs also include physicians who allege they have previously prescribed or administered treatments that S.B. 14 now prohibits and would continue to do so but for the statute. Defendants assert these physicians lack standing to assert their patients' claims. We need not address that issue because we conclude these physicians have standing to press their own claims—that S.B. 14 infringes on their claimed right to occupational freedom. And because the plaintiff parents and physicians, together, have standing to assert each of the three alleged constitutional violations, we can proceed to the merits with our jurisdiction secure and without addressing whether the plaintiff organizations also have standing.

### III. Are plaintiffs entitled to a temporary injunction?

To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The Court reviews an order granting a temporary injunction for

11

an abuse of discretion. *Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, 660 S.W.3d 108, 116 (Tex. 2023). Under this standard, we defer to the trial court's factual findings if they are supported by the evidence, but we review legal determinations de novo. *Haedge v. Cent. Tex. Cattlemen's Ass'n*, 603 S.W.3d 824, 827 (Tex. 2020).

Here, plaintiffs make a facial challenge to the constitutionality of S.B. 14, seeking a declaration that it is unconstitutional "in its entirety." The ultimate question of whether a statute violates the Constitution is a question of law. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932 (Tex. 1998).[11]

When a party challenges the constitutionality of a statute, we begin with a strong presumption that the statute is valid. *See Hegar v. Tex. Small Tobacco Coal.*, 496 S.W.3d 778, 785 (Tex. 2016) ("[A] challenged statute is entitled to a 'strong presumption' of constitutional validity." (quoting *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex. 1989))); *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015) ("[S]tatutes are presumed to be constitutional."); *Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.*, 454 S.W.2d 729, 732 (Tex. 1970) ("Legislative enactments will not be held unconstitutional and invalid unless it is absolutely necessary to so hold."); *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968) ("It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a

---

[11] Although the trial court labeled as "findings" its conclusions that S.B. 14 likely violates the Constitution, we are not bound by this designation with respect to applying the appropriate standard of review. *Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 n.7 (Tex. 2019).

12

sufficient basis for striking down legislation as arbitrary or unreasonable. The wisdom or expediency of the law is the Legislature's prerogative, not ours.").

As in the trial court, plaintiffs here assert that S.B. 14 is facially unconstitutional for three reasons: (1) it infringes on the fundamental rights of parents to make decisions concerning the care of their children in violation of Article I, Section 19 (the Due Course of Law Clause); (2) it deprives Texas physicians of a vested property interest in their medical licenses and infringes on the occupational freedoms of Texas healthcare providers in violation of the Due Course of Law Clause; and (3) it discriminates against transgender children and their parents because of sex and transgender status in violation of Article I, Section 3 (the Equal Protection Clause) and Article I, Section 3a (the Equal Rights Amendment). The trial court concluded that plaintiffs established a probable right to relief on all three constitutional challenges. We address each of these theories in turn.

## A. Does the statute unconstitutionally infringe on parents' ability to make medical decisions for their children?

First, the trial court concluded the statute likely violates the Due Course of Law Clause "by infringing upon the fundamental right of parents to make decisions concerning the care, custody, and control of their children." According to the trial court, this right includes the right of parents "to give, withhold, and withdraw consent to medical treatment for their children" as well as "to seek and to follow medical advice to protect the health and wellbeing of their minor children."

13

### 1. Applicable law

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. We have adopted a two-step inquiry to determine whether a government action violates our Constitution's guarantee of "due course of the law." *See Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 905 (Tex. 2021) (citing *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)). First, we consider whether the plaintiff has a liberty, property, or other enumerated interest that is entitled to protection. *Id.* Second, if a protected interest is implicated, we consider whether the defendant followed due course of law in depriving the plaintiff of that interest. *Id.* This inquiry requires a careful analysis of the interest of which the plaintiff is allegedly being deprived. *See id.* (noting that a constitutional challenge to a student's dismissal for poor academic performance requires courts to focus on whether the dismissal "interferes with the student's liberty interest in his or her reputation and employability, not on whether education is a protected liberty interest"); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (stating that the U.S. Supreme Court requires a "careful description" of the asserted fundamental liberty interest (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993))).

If there is no deprivation of a constitutionally protected interest, then a statute satisfies the Due Course of Law Clause as long as it is rationally related to a legitimate state purpose. *See Barshop v. Medina*

14

*Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 633 (Tex. 1996).

This Court has repeatedly recognized that parents have a fundamental interest in making decisions regarding the care, custody, and control of their children. A half century ago, we recognized that this "natural right" between parents and children is "one of constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). We thus held that when the State seeks a parental termination order or other action that "permanently sunders those ties," those proceedings should be "strictly scrutinized." *Id.*; *see also Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985) ("[T]ermination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent.").

Similarly, we have recognized that nonparents may not be afforded rights of possession or other rights concerning a child's care without first overcoming the presumption that a fit parent acts in the child's best interests. Quoting the U.S. Supreme Court's plurality opinion in *Troxel v. Granville,* we stated, "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family . . . ." *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (alteration in original) (quoting *Troxel v. Granville*, 530 U.S. 57, 68 (2000) (plurality op.)). Plaintiffs point to these cases to support their assertion that the statute unconstitutionally infringes on what should be an unfettered right of parents to exercise absolute control over decisions regarding a child's medical treatment.

15

Plaintiffs' argument has some force, but only up to a point. Parents' right to exercise control over decision-making for their children has limits: "the rights of natural parents are not absolute." *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994); *see also DeWitt v. Brooks*, 182 S.W.2d 687, 690 (Tex. 1944) ("While ordinarily the natural parents are entitled to the custody and care of their child, this is not an absolute unconditional right.").

Of significance here, we have never questioned the Legislature's constitutional authority to regulate medical treatments—including by prohibiting certain treatments outright—for both adults and children. *See* TEX. CONST. art. XVI, § 31 ("The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State . . . ."); *Martinez v. Tex. State Bd. of Med. Exam'rs*, 476 S.W.2d 400, 405 (Tex. App.—San Antonio 1972, writ ref'd n.r.e.) ("[T]he Legislature was expressly granted the constitutional authority to regulate the practice of medicine."); *Kelley v. Tex. State Bd. of Med. Exam'rs*, 467 S.W.2d 539, 546 (Tex. App.—Fort Worth 1971, writ ref'd n.r.e.) ("It is the right and duty of the State to regulate and control medical practice, so that the public safety and welfare will be served and promoted."). Indeed, state legislatures have long played a critical and recognized role in regulating health and welfare, which is why those efforts receive "a strong presumption of validity." *L.W. v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)), *cert. granted*, 2024 WL 3089532 (U.S. June 24, 2024) (No. 23-477); *see also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical

16

profession."); *Garcia v. Tex. State Bd. of Med. Exam'rs*, 384 F. Supp. 434, 437 (W.D. Tex. 1974) (three-judge panel) ("This right of a State to regulate under its police powers all aspects of the practice of medicine and thereby help provide for the general health and welfare of its citizens is of such vast importance as to approach the status of a duty."), *aff'd*, 421 U.S. 995 (1975). In short, our precedents acknowledge that parental rights, though weighty, at times give way to other competing interests such as the interest in protecting children from harm. This is underscored by our Constitution's express authorization of legislative regulation of the practice of medicine. Thus, to the extent parents possess a fundamental interest in obtaining medical care for their children, it has extended only to those medical treatments that are legally available.

## 2. Analysis

We conclude that the parent plaintiffs failed to establish a probable right to relief on their claim that the statute unconstitutionally deprives them of a protected interest. When analyzing a challenge under the Due Course of Law Clause, we first determine whether the plaintiff has identified a "liberty, property, or other enumerated interest" that is entitled to protection. *Villarreal*, 620 S.W.3d at 905. We then examine whether the State "depriv[ed]" the plaintiff of that interest and, if so, whether it failed to follow due course of law in doing so. *Id.*

*Glucksberg* provides a useful guide. In that case, the plaintiffs sued for a declaration that a Washington statute prohibiting assisted suicide was unconstitutional under the Due Process Clause of the

Fourteenth Amendment. 521 U.S. at 707–08. In concluding that the statute was constitutional, the Supreme Court's analysis focused on whether "the asserted 'right' to assistance in committing suicide" is a fundamental liberty interest protected by the U.S. Constitution. *Id.* at 728. The Court rejected an approach that would have defined the asserted right more broadly as a natural extension of "abstract concepts of personal autonomy." *Id.* at 725. Plaintiffs here (and the dissent) likewise seek to define the asserted right as nothing more than an extension of "parental autonomy." The *Glucksberg* Court explained the Constitution requires a carefully circumscribed description of the asserted right or liberty interest at issue:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Id.* at 720 (citations and internal quotation marks omitted).

The Supreme Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21 (citations and internal quotation marks omitted). We apply a similar analysis in reviewing plaintiffs' claim that S.B. 14 deprives them of a constitutionally protected right. *See Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 656 (Tex. 2022) ("[W]e should

18

define the interest as specifically as necessary to accurately reflect the constitution's language ('liberty' and 'property'), our precedential construction of that language, and the realities of the deprivation the [plaintiffs] are claiming.").

Plaintiffs assert that S.B. 14 violates the Due Course of Law Clause by infringing on parents' "fundamental autonomy right to make decisions about their children's care, including directing their medical care." We have previously described "[p]arental control and autonomy" as a "fundamental liberty interest." *In re Scheller*, 325 S.W.3d 640, 644 (Tex. 2010) (quoting *In re Derzapf*, 219 S.W.3d 327, 335 (Tex. 2007) (quoting *Troxel*, 530 U.S. at 65)). Indeed, we have described the "natural right" between parents and their children as one "of constitutional dimensions." *Wiley*, 543 S.W.2d at 352. Certainly, then, when the State seeks to sever the parent–child relationship, those proceedings must be "strictly scrutinized." *Id.*

But neither our society's history and legal traditions nor this Court's precedents support a view of the scope of parents' constitutionally protected interest in directing their children's care, custody, and control that would place *any* action a parent may undertake outside the government's authority to regulate. *See J.W.T.*, 872 S.W.2d at 195; *DeWitt*, 182 S.W.2d at 690. This plays out in various contexts, many of which are deeply embedded in our legal history. Some longstanding restrictions on children's activities, like prohibiting child labor and access to tattoos and tobacco, limit parental authority. *See* TEX. LAB. CODE § 51.011 (prohibiting the employment of a child younger than fourteen except under limited circumstances); TEX. HEALTH &

19

SAFETY CODE § 146.012(a)(1), (a-1) (prohibiting a child younger than eighteen from obtaining a tattoo, even with parental consent, except to cover certain other tattoos or markings); *id.* § 161.082(a) (prohibiting the giving or selling of cigarettes or tobacco products to someone younger than twenty-one). Tattoos provide a particularly apt example, as they involve what is in most cases a permanent adjustment to the human body that is not intended to restore the body's physical condition but instead applied for psychological reasons. The Legislature prohibits children from being tattooed, even with their parents' consent, both because children may not fully appreciate the consequences of their actions and because of the risk that parents may be imposing their own desires, however well-meaning, on the child.

Whatever the context in which they arise, these examples demonstrate that, while parents have a large degree of control and authority to decide what is best for their children, parental control and authority have never been understood as constitutionally mandated absolutes. Said differently, a fit parent's fundamental interest in caring for her child free from government interference extends to choosing from among legally available medical treatments, but it never has been understood to permit a parent to demand medical treatment that is not legally available. The U.S. Supreme Court cases on which our Court relied in recognizing the "constitutional dimensions" of parental rights likewise acknowledged that the scope of parental authority has always had limits. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) ("It is true that activities of individuals, even when religiously based, are often

subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare . . . .").

Carefully described, the purported right for which plaintiffs seek constitutional protection is the right of parents to allow their children access to relatively new medical procedures and treatments for a relatively newly defined medical condition. Plaintiffs claim this asserted right is merely a part of their constitutionally recognized interest in "parental autonomy." But just as the U.S. Supreme Court did in *Glucksberg*, and the Sixth Circuit recently did in a case nearly identical to this one, we decline the invitation to extend constitutional protection to a claimed right—thus placing it "outside the arena of public debate and legislative action"—merely because the conduct, were it allowed, would entail the exercise of parental judgment or decision-making. 521 U.S. at 720; *see Skrmetti*, 83 F.4th at 475 ("[C]laimants overstate the parental right by climbing up the ladder of generality to a perch—in which parents control all drug and other medical treatments for their children—that the case law and our traditions simply do not support.").

Plaintiffs' argument is particularly weak in the context of medical care, as the Legislature has express constitutional authority to regulate the practice of medicine. TEX. CONST. art. XVI, § 31. If it may exercise that authority to regulate the practice of medicine and available treatments for adults, it surely must be true that it may do the same for treatments for children. Nor is there support for the idea that regulation of children's medical treatments would be more closely scrutinized than

regulation of medical treatments for adults because children's medical treatments usually require parental consent on the child's behalf.

Our dissenting colleague places much weight on *Parham v. J. R.*, 442 U.S. 584 (1979), which involved a procedural due process claim and does not support a conclusion that parents' fundamental interest in their children's care includes a right to obtain any medical treatment for them, such as those at issue here. The issue in *Parham* was whether a state statute that allowed parents to commit their children to a psychiatric hospital unconstitutionally deprived the children of procedural due process because there was no formal hearing before they were committed. *See id.* at 596–97. In concluding the statute passed constitutional muster, the Court considered the children's liberty interest in freedom from confinement together with the interests of the parents and the State. *Id.* at 600–06. The Court noted that parents generally have "broad parental authority" over their children as well as a "high duty" to seek and follow medical advice. *Id.* at 602. And it acknowledged the presumption that parents act in their children's best interests, though it noted that presumption can be rebutted. *Id.* But nothing in the Court's opinion suggests that it was recognizing a substantive constitutional right for parents to obtain novel medical care for their children. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 286 (1990) ("[P]etitioners would seek to turn a decision [*Parham*] which allowed a State to rely on family decisionmaking into a constitutional requirement that the State recognize such decisionmaking. But constitutional law does not work that way."). As the Sixth Circuit concluded, "[t]his traditional due process ruling does not support today's

22

untraditional request for relief under substantive due process." *Skrmetti*, 83 F.4th at 476–77.[12]

We need not and do not hold that the Legislature could withdraw from parents the authority to choose any legal, available medical treatment. Rather, we hold only that novel treatments for a novel condition are generally within the Legislature's power to regulate without facing heightened scrutiny. *See Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997) ("[W]hen a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" (quoting *Jones v. United States*, 463 U.S. 354, 370 (1983))). Plaintiffs' expert testified that the first use of puberty blockers for children with gender dysphoria was in Europe in the 1990s, and the earliest identified study regarding the effectiveness and risks of the treatments at issue here was published in 2009. Whatever the precise contours of the fundamental liberty interest held by parents, the notion that it includes a right to pursue the treatments at issue here is not "deeply rooted in our history and traditions." *Glucksberg*, 521 U.S. at 727; *see also Skrmetti*, 83 F.4th at 475 ("This country does not have a custom of permitting parents to obtain banned medical treatments for their children and to override contrary legislative policy judgments in

---

[12] In rejecting the dissenters' argument that only an adversarial hearing could protect the children's procedural due process rights, the *Parham* Court criticized them for "[r]elying on general statements from past decisions dealing with governmental actions not even remotely similar to those involved here." 442 U.S. at 608 n.16. The dissent here likewise relies on general statements regarding parental autonomy in unrelated contexts to support its one-size-fits-all approach to reviewing the Legislature's actions.

the process."); *Eknes-Tucker v. Governor*, 80 F.4th 1205, 1224 (11th Cir. 2023) ("[N]one of the binding decisions regarding substantive due process establishes that there is a fundamental right to treat one's children with transitioning medications subject to medically accepted standards." (alteration and internal quotation marks omitted)); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 & n.18 (D.C. Cir. 2007) (en banc) (identifying multiple courts that have "rejected arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government"). Moreover, the contours of a constitutional right do not turn on plaintiffs' assertion that a particular treatment is currently "recognized by the medical community." *See Jones*, 463 U.S. at 364 n.13 ("We do not agree with the suggestion that Congress' power to legislate in this area depends on the research conducted by the psychiatric community."); *Eknes-Tucker*, 80 F.4th at 1224 ("[T]hose decisions applying the fundamental parental right in the context of medical decision-making do not establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children as long as a critical mass of medical professionals approve.").[13]

---

[13] The dissent describes the medical treatments at issue as the product of "well-established industry standards." *Post* at 11 (Lehrmann, J., dissenting). It relies heavily on standards of care promulgated less than two years ago by the World Professional Association for Transgender Health (WPATH), an organization whose mission includes "advocacy that affects the lives of [transgender and gender diverse] people." E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INT'L J. TRANSGENDER HEALTH S1, S5 (2022). Although WPATH had

While S.B. 14 limits the availability of novel medical treatments for children diagnosed with a novel medical condition, it does not deprive those children's parents of any constitutionally protected right or undermine a custom embedded in our history or traditions. The statute does not sever parents' control or autonomy to make medical decisions for their children, nor does it displace a child's parent as the ultimate decision maker. The law merely restricts the availability of new treatments with which medical providers may treat children diagnosed with a newly defined medical condition, gender dysphoria. It therefore

previously issued standards of care for treatment of transgender individuals, it describes its 2022 standards as "the first to be developed using an evidence-based approach." WPATH, *SOC8 History and Purpose* 1.3, https://www.wpath.org/soc8/history (last visited June 26, 2024). In issuing its 2022 standards, however, WPATH "note[d] the paucity of research supporting the long-term effectiveness of medical treatment for adolescents with gender dysphoria." Chad Terhune et al., *As more transgender children seek medical care, families confront many unknowns*, REUTERS, Oct. 6, 2022, https://reuters.com/investigates/special-report/usa-transyouth-care/; *see also* Coleman, *supra*, at S46 ("[A] systematic review regarding outcomes of treatment in adolescents is not possible."). Earlier this year, a series of leaked internal communications revealed that "the provision of so-called gender-affirming care is riddled with far more doubt than WPATH's message that such treatments are 'not considered experimental'." *The WPATH files: Leaked conversations throw light on a controversial field of medicine*, THE ECONOMIST, Mar. 9, 2024, at 25.

The novelty of using medical treatments and procedures on children with gender dysphoria is further demonstrated by the fact that it is only within the last decade or so that medical organizations like the American Psychiatric Association and the World Health Organization moved away from characterizing gender dysphoria as a purely mental-health disorder. *See Transgender no longer recognised as "disorder" by WHO*, BBC NEWS (May 29, 2019), https://www.bbc.com/news/health-48448804; Traci G. Lee, *Being transgender no longer a "mental disorder": APA*, NBC NEWS (Dec. 4, 2012) https://www.nbcnews.com/id/wbna50075205.

will satisfy the Due Course of Law Clause if it is rationally related to a legitimate state purpose. *See Barshop*, 925 S.W.2d at 633.[14]

Plaintiffs contend that the statute falls short of even this bar because it is "rooted in anti-transgender animus." In support, they first argue that the evidence establishes that each of the prohibited procedures is safe, effective, and accepted in the medical community.[15] But a court's determination regarding the ultimate correctness of the Legislature's findings is not a proper basis for rejecting a statute. *Owens Corning v. Carter*, 997 S.W.2d 560, 582 (Tex. 1999); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995). Plaintiffs do not

---

[14] In applying this standard, we need not and do not decide whether every law that could be argued to infringe on a fit parent's interest in directing the care, custody, and control of her child would also be subject to the same level of scrutiny. Whether it would depends on many factors, including (to name just two): (1) whether there is express constitutional authorization for or prohibition against the challenged law; and (2) whether the regulated conduct is novel or firmly supported in our history and traditions. These considerations are not exhaustive but merely meant to illustrate that our holding today should not be read to mean that one size fits all. We do not foreclose the possibility that a different law that could be argued to constitute an impermissible encroachment on a fit parent's rights *could* be subject to heightened scrutiny.

[15] The dissent twice characterizes testimony from the State's expert, Dr. Cantor, as an admission that his position was contrary to "the entire medical establishment." *Post* at 15, 29 (Lehrmann, J., dissenting). Dr. Cantor was responding to a question pointing out that an Alabama federal district court judge (whose order enjoining a statute similar to Texas's was later vacated by the Eleventh Circuit) gave his testimony little weight. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142–43 (M.D. Ala. 2022), *rev'd sub nom. Eknes-Tucker v. Governor*, 80 F.4th 1205 (11th Cir. 2023). A fairer reading of his testimony is that he was theorizing that the district court judge may have justified minimizing his opinion by viewing it as "essentially me versus the entire medical establishment." As he made clear elsewhere in his testimony, Dr. Cantor's opinion is that the medical research studies do not support any established treatment for children with gender dysphoria, an opinion supported by health agencies in Europe. *See* Ghorayshi, *supra* note 2.

(and cannot) dispute that the Legislature has legitimate interests in both regulating medical procedures and in protecting the health and wellbeing of children. Accordingly, we uphold the law if it is rationally related to a legitimate government interest. *See Owens Corning*, 997 S.W.2d at 580; *Barshop*, 925 S.W.2d at 633.

Notwithstanding this Court's or the trial court's views, the Legislature had a rational basis for concluding that the risk of providing these treatments to children solely for the purpose of physically transitioning from their sex at birth was not outweighed by the benefits. Plaintiffs respond that the prohibition based on the Legislature's perceived risk of harm to children is pretextual because the exceptions permit these same treatments for other medical conditions. But the decision to prohibit particular medical procedures for a certain condition is based on a balance between both risks and benefits of the treatment in contrast to other treatments for the same underlying condition. The Legislature could rationally reach different conclusions on the balance of risks and benefits when physical treatments are used to treat a purely physical condition (such as precocious puberty) as opposed to a condition like gender dysphoria, for which other treatment options exist. Indeed, policymakers in many other states, as well as other nations, have made similar judgments.

Plaintiffs also cite the statute's legislative history, focusing on statements by lawmakers that, they contend, demonstrate that the statute's enactment was motivated by a "desire to harm transgender

adolescents."[16]  The State rejects this characterization of the statements, but we need not decide which interpretation is correct.  Even if we assume the legislative history demonstrates someone voting for this bill may have been improperly motivated, that constitutes no evidence that all, most, or even a significant percentage of the over 100 legislators who voted for the statute were similarly motivated.  *See Tex. Health Presbyterian Hosp. v. D.A.*, 569 S.W.3d 126, 136–37 (Tex. 2018) ("An individual legislator's statements—even those of the bill's author or sponsor—do not and cannot describe the understandings, intentions, or motives of the many other legislators who vote in favor of a bill.").

**B. Does the statute unconstitutionally infringe on physicians' property rights or medical providers' occupational freedom?**

The trial court also concluded that S.B. 14 likely violates the Due Course of Law Clause "by infringing upon Texas physicians' right of occupational freedom."  The court went on to say that the statute "deprives Texas physicians of a vested property interest in their medical licenses"; that it "interferes with the professional relationship among medical providers, adolescent patients, and the patients' parents"; and that the statute is "clearly arbitrary and its effect as a whole is so unreasonably burdensome that it is oppressive."

---

[16] The specific statements plaintiffs identify in their pleadings are (1) one senator's depictions of gender dysphoria as a "social contagion" and a "mental delusion" and (2) one representative's reference to the medical treatment of gender dysphoria as "harmful experimentation" and comparing it to the opioid epidemic and the use of lobotomies to treat schizophrenia or depression.

28

### 1. Applicable law

Again, the first step in our inquiry under the Due Course of Law Clause is to carefully define the interest of which these plaintiffs are allegedly being deprived. *Villarreal*, 620 S.W.3d at 905. If the plaintiffs are not deprived of a constitutionally protected interest, the statute is constitutional so long as it is rationally related to a legitimate state purpose. *Barshop*, 925 S.W.2d at 633.

In *Patel v. Texas Department of Licensing & Regulation*, this Court held that an as-applied challenge to an economic regulation statute based on the Due Course of Law Clause "must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." 469 S.W.3d at 87. But, as with parental rights, a person's protected work-related interests "are not without limits." *Crown Distrib.*, 647 S.W.3d at 654. We underscored the point in *Crown Distributing*: "[n]either 'property rights nor contract rights are absolute.'" *Id.* (quoting *Nebbia v. New York*, 291 U.S. 502, 523 (1934)).

### 2. Analysis

We conclude the physicians and healthcare providers failed to establish a probable right to relief on their claims under the Due Course of Law Clause. As with plaintiffs' arguments regarding parental rights, the arguments on behalf of these plaintiffs incorrectly characterize the

29

scope of the constitutionally protected interest of which the statute allegedly deprives them.

Plaintiffs argue that Texas physicians have a vested property interest in their medical licenses and that, under S.B. 14, those licenses "shall" be revoked if they provide prohibited medical care to children. *See* TEX. OCC. CODE § 164.0552(a). Plaintiffs therefore urge that the statute must be subject to strict scrutiny. We disagree. To the extent that a license to practice medicine can be construed as a property interest, that interest is subject to regulation and not absolute. Our Constitution expressly authorizes the Legislature to "pass laws prescribing the qualifications of practitioners of medicine." TEX. CONST. art. XVI, § 31. In accordance with that constitutional mandate, the Legislature enacted the Medical Practice Act, expressly finding that "the practice of medicine is a privilege and not a natural right of individuals" and that legislative regulation of that privilege and its subsequent use and control "is necessary to protect the public interest." TEX. OCC. CODE § 151.003(1). That authorization necessarily includes the ability to prohibit certain practices altogether.

In short, a medical license does not confer on physicians a right to practice medicine in any way they see fit. To the extent that the State's granting a medical license creates a protected property interest, that interest does not extend to practices that the State has determined to be unlawful. In other words, Texas physicians have no constitutionally protected interest to perform medical practices that the Legislature has rationally determined to be illegal.

30

Plaintiffs rely on *House of Tobacco, Inc. v. Calvert*, in which we described a permit authorizing the sale of tobacco products as a "privilege which does not have to be granted; however, once it is granted, it cannot be taken away except for good cause." 394 S.W.2d 654, 657 (Tex. 1965). We therefore held that the State Comptroller's order revoking the permit was void because the permit holder was first entitled to notice and a hearing under the Due Course of Law Clause. *Id.* at 658. But we have never held that the granting of a medical license, or any license, gives the holder a substantive property right to engage in conduct without limitation by the Legislature.

Plaintiffs cannot show that the statute unconstitutionally infringes on a protected property interest. And plaintiffs have not alleged that the procedural protections required to revoke a medical license, including notice and an opportunity to be heard, *see* TEX. OCC. CODE § 164.004, the physician's right to administrative review, *see id.* § 164.007, and the physician's right to judicial review, *see id.* § 164.009, are constitutionally inadequate. We therefore reject plaintiffs' Due Course of Law Clause claim with respect to physicians' medical licenses.

Plaintiffs next argue that S.B. 14 unconstitutionally infringes on medical providers' liberty interest "to engage in their occupations." They contend that the threat of license revocation and discipline for engaging in practices prohibited by the Legislature is "clearly arbitrary and so unreasonably burdensome that it is oppressive." *See Patel*, 469 S.W.3d at 87 (holding that an economic-regulation statute violates the Due Course of Law Clause as applied to the challenging party if its effect as a whole is so unreasonably burdensome that it becomes oppressive in

relation to the underlying governmental interest). We need not decide whether the standard we announced in *Patel* applies here because plaintiffs cannot show that this statute, or any statute that limits particular medical treatments for children, imposes an unreasonable burden on physicians' ability to practice medicine. The statute does not prevent medical providers from treating children with gender dysphoria with treatments other than those that are prohibited, nor does it prohibit them from providing those medical procedures to adults.

## C. Does the statute unconstitutionally deny or abridge equality under the law?

Finally, the trial court concluded that S.B. 14 likely violates Article I, Sections 3 and 3a "by discriminating against transgender adolescents with gender dysphoria because of their sex, sex stereotypes, and transgender status."

### 1. Applicable law

Article I, Section 3 of the Texas Constitution provides the following guarantee of equal rights: "All freemen, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX. CONST. art. I, § 3. We have typically referred to Section 3 as our Constitution's "equal protection" clause. *See Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 257 n.4 (Tex. 2002). In 1972, Texans adopted the Equal Rights Amendment, which states, "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." TEX. CONST. art. I, § 3a. For convenience, we will refer to these two provisions jointly as the Equal Rights Clauses.

We evaluate alleged violations of the Equal Rights Clauses in three steps. *Bell*, 95 S.W.3d at 257 (citing *In re McLean*, 725 S.W.2d 696, 697 (Tex. 1987) (plurality op.)). First, we examine whether "equality under the law" has been denied. *Id.* If it has, then we determine whether equality was denied because of a person's membership in a protected class of sex, race, color, creed, or national origin. *Id.* (citing *McLean*, 725 S.W.2d at 697). If we conclude that equality was denied because of a person's membership in a protected class, the challenged action cannot stand unless it is narrowly tailored to serve a compelling governmental interest. *Id.* (citing *McLean*, 725 S.W.2d at 698).

We have applied this framework in an analogous case, *Bell*. There, we concluded that the State's restrictions on abortion funding did not deny equality "because of" sex, even though only women could become pregnant. *Id.* at 263–64. We distinguished the "overt gender-based distinction" of a statute we held unconstitutional in *McLean*, which imposed different burdens on fathers and mothers seeking the same relief. *Bell*, 95 S.W.3d at 258; *see McLean*, 725 S.W.2d at 697. We reasoned that the restriction in *Bell* was directed at abortion as a medical treatment, and we held that the funding scheme was not "merely a pretext designed to prefer males over females in the provision of health care." 95 S.W.3d at 258.

### 2. Analysis

We conclude that S.B. 14 does not deny or abridge "[e]quality under the law" because of plaintiffs' membership in any protected class. *See* TEX. CONST. art. I, § 3a; *Bell*, 95 S.W.3d at 257. Plaintiffs argue that

33

the statute discriminates against them because of sex, a protected class under the Equal Rights Clauses. They contend the statute does so in two ways: (1) it facially discriminates by denying certain medical treatments based on whether the intended recipient is male or female; and (2) it discriminates against transgender people, which plaintiffs contend "is necessarily sex discrimination."

With respect to plaintiffs' first argument, under the statute, no person is "treated differently from others similarly situated" based on their sex. *See Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) (quoting *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 647 (Tex. 2004)). The statute treats both males and females receiving treatment for gender dysphoria the same by prohibiting medical providers from prescribing or supplying cross-sex hormone therapy or other treatments that conflict with the child's sex at birth. Recent decisions from the Sixth and Eleventh Circuits are in accord. *See Skrmetti*, 83 F.4th at 480 ("Such an across-the-board regulation lacks any of the hallmarks of sex discrimination. It does not prefer one sex over the other."); *Eknes-Tucker*, 80 F.4th at 1228 (concluding that Alabama's statute "refers to sex only because the medical procedures that it regulates . . . are themselves sex-based" and therefore it "does not establish an unequal regime for males and females"). The mere fact that the statute identifies hormones that are prohibited for males and others that are prohibited for females does not deny or abridge equal treatment because of sex. We rejected a similar argument in *Bell*, concluding that a statutory restriction on funding for abortion as a medical treatment

34

did not prefer males over females in the provision of health care, even though only females can get pregnant. 95 S.W.3d at 258.

Plaintiffs also argue that the statute discriminates against "transgender people" because it prohibits certain medical treatments only if those treatments are intended to transition a patient from one sex to another. Although they acknowledge that "transgender status" is not one of the protected classes enumerated in the Constitution, they argue that it "is necessarily sex discrimination." Plaintiffs primarily rely on *Bostock v. Clayton County*, in which the U.S. Supreme Court held that firing an employee for being transgender violates Title VII's statutory prohibition against "discriminat[ing] . . . because of such individual's . . . sex." 590 U.S. 644, 655, 662 (2020) (quoting 42 U.S.C. § 2000e-2(a)(1)). But the Supreme Court's interpretation of Title VII, which focuses on but-for discriminatory acts by individual employers, does not apply to the Texas Constitution's textually distinct guarantee that "[e]quality under the law shall not be denied or abridged because of sex." TEX. CONST. art. I, § 3a. As noted above, the prohibitions in S.B. 14 do not treat any person differently from those in a similar situation because of that person's sex. *See Klumb*, 458 S.W.3d at 13; *Bell*, 95 S.W.3d at 258.

Finally, plaintiffs argue that S.B. 14 "categorizes on the basis of an inherently suspect characteristic" and therefore should be subject to strict scrutiny under Article I, Section 3. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 639 (Tex. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). But this Court has previously concluded that Section 3a "is more extensive and provides more specific protection

35

than" Section 3. *McLean*, 725 S.W.2d at 698. Since the Equal Rights Amendment's adoption in 1972, this Court has never expanded the Equal Rights Clauses' protection to classifications that fall outside those enumerated in Section 3a. We decline plaintiffs' invitation to create a new protected class beyond those Texas voters have adopted. *See In re J.C.*, 594 S.W.3d 466, 477 (Tex. App.—Fort Worth 2019, no pet.) ("[R]espect for the separation of powers should make courts reluctant to establish new suspect classes." (internal quotation marks omitted) (quoting *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996))).[17]

---

[17] A divided Fourth Circuit, sitting en banc, recently concluded that state healthcare plans in North Carolina and West Virginia that excluded coverage for surgeries designed to treat gender dysphoria were subject to heightened (intermediate) scrutiny and were unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Kadel v. Folwell*, 100 F.4th 122, 155–56, 156–57 (4th Cir. 2024) (en banc). *Kadel*'s reasoning is inapplicable here. The majority concluded that the states' restriction on surgeries to treat gender dysphoria necessarily discriminated based on sex or gender identity because "only transgender people would get" those surgeries. *Id.* at 148. This is contrary to *Bell*, in which we held that a restriction directed at a particular medical condition—pregnancy—that affected only women did not, for that reason, implicate our Equal Rights Clauses. *Bell*, 95 S.W.3d at 258; *see also Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation . . . on any reasonable basis . . . .").

### IV. Conclusion

Plaintiffs failed to establish a probable right to relief on any of their three asserted constitutional violations. We therefore reverse and vacate the trial court's Temporary Injunction Order.

Rebeca A. Huddle
Justice

**OPINION DELIVERED:** June 28, 2024